**2017 UT App 132**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
FRANK PAUL REYOS,
Appellant.

Opinion
No. 20150338-CA
Filed July 28, 2017

Third District Court, Salt Lake Department
The Honorable Robin W. Reese
No. 121909903

Herschel Bullen, Attorney for Appellant

Sean D. Reyes and William M. Hains, Attorneys
for Appellee

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
STEPHEN L. ROTH and MICHELE M. CHRISTIANSEN concurred.

TOOMEY, Judge:

¶1     A sixteen-year-old boy (Victim) was shot and killed, and his body was left in a ditch by people he considered friends. In connection with Victim's death, Frank Paul Reyos was convicted of aggravated murder and possession or use of a firearm by a restricted person. He appeals his convictions, and we affirm.

BACKGROUND

¶2     Late one Saturday night,[1] Mary[2] texted Victim from a party at an East Side Salt Lake City residence to tell him she was being harassed about a tattoo identifying her as a West Side resident. At the time he received this text, Victim was driving around with Reyos and Sarah. They drove to the party, and Sarah remained in the car while Reyos and Victim got out. A fight erupted in front of the house, and as many as twenty gunshots were fired. When Sarah heard the shots and saw Victim run past her car, she drove closer to the house to retrieve Reyos, who was surrounded and being beaten by several people. Reyos was able to escape and get into the car. Sarah suggested they try to find Victim, but Reyos responded, "F him. He left me."

¶3     Sarah and Reyos went to a motel where Sarah had been staying, and she helped him clean up. After that, Sarah drove Reyos to a friend's house and then returned to the motel. Around 7:00 a.m. on Sunday morning, Victim arrived at the motel and a nervous Sarah cautioned him to "lay low for a little while" because Reyos was "upset" that Victim had abandoned him during the fight. She repeated the warning because Victim did not appear to take it seriously, ominously adding that Reyos was "not just going to forget about it." Victim remained unconcerned, explaining he ran away because his gun had jammed and he "didn't want those fools to take it away." Victim called Mary around 10:00 a.m. to ask for a ride home, but Mary put him off.

---

1. The tragic sequence of events underlying this case began late in the evening of August 25, or early in the morning of August 26, 2012.

2. We use pseudonyms to protect the privacy of Victim and the witnesses in this case.

¶4     Around midday, Victim was still at the motel when Reyos and Michael arrived by car. Sarah was nervous and scared that something might "go down." Reyos and Victim argued briefly but then acted as though they were "cool." After the four smoked methamphetamine, Reyos announced that he, Victim, and Michael would go to a shooting range to figure out what was wrong with Victim's gun. Reyos did not want Sarah to accompany them but relented after Sarah insisted on going. Sarah did this because she "had a bad feeling" and felt she needed to accompany them. They left the motel, with Michael at the wheel, but instead of going to a shooting range, they drove around, ostensibly looking for something to steal. Reyos eventually directed Michael to pull onto a dirt alley running through the middle of a block in the Sugar House neighborhood of Salt Lake City.

¶5     Reyos and Victim emerged from the car while Michael remained behind the wheel. Sarah tried to follow, but Reyos prevented her from getting out. Victim and Reyos walked between two fences concealed by a grove of trees and separated by a small, shallow ditch. There, Reyos put a gun to Victim's head and shot him, leaving Victim lying in the ditch. Sarah did not see Reyos shoot Victim, but she heard the gunfire and knew what had happened. A smirking Reyos returned to the car, and the three left the scene, eventually parting company with one another.

¶6     Sarah was afraid of Reyos and attempted to avoid him, but Reyos nevertheless managed to speak to her, directing her not to disclose what happened and offering a story she could tell people if questioned. When the police interviewed Sarah about Victim's death, she initially denied knowing anything, then gave the story Reyos suggested, and finally, about two weeks later, told them Reyos had killed Victim. Sarah testified she finally disclosed the real story because lying about it was "eating at" her and causing her nightmares. She also testified she "couldn't lie anymore" and wanted closure for Victim's family.

¶7     During an interview with police, John, an acquaintance of Reyos, stated he had a conversation in which Reyos admitted killing Victim. Reyos told John that he shot Victim because Victim "set him up" the night of the fight. At the conclusion of the interview, John signed a document attesting to the veracity of his statement. But at trial, John testified he had no recollection of making the statement to the police or signing the document, even after listening to a recording of the interview the week before trial. He admitted, however, that the signature on the document looked like his and the voice on the recording sounded like him. John also testified he had no recollection of the conversation with Reyos. After John finished testifying, the State played a recording of John's police interview and asked the interviewing detective about it. Although defense counsel had cross-examined John about the interview, they chose not to ask the detective any questions about it.[3]

¶8     John's girlfriend testified that although she had not been present when John signed the written statement, the signature looked like his. The lead detective, however, testified that John's girlfriend *was* present when John signed the statement, as were three other people. Reyos objected to the admission of any of John's statements to the police, but the trial court overruled the objection on the ground that they were admissible as non-hearsay under rule 801 of the Utah Rules of Evidence.

¶9     After the jury determined Reyos intentionally or knowingly caused Victim's death, the State submitted evidence that Reyos had previously been convicted of aggravated robbery. In light of the aggravating offense, the jury convicted

---

3. Reyos was represented by three attorneys at trial, with one attorney cross-examining John and a different attorney cross-examining the detective.

Reyos of aggravated murder.[4] The jury also convicted Reyos of possession or use of a firearm by a restricted person.

¶10    The trial court sentenced Reyos to life in prison without the possibility of parole for the aggravated murder and a consecutive term of one to fifteen years in prison for possession of a dangerous weapon. Reyos filed a timely appeal.

ISSUES AND STANDARDS OF REVIEW

¶11    Reyos raises three issues on appeal but pursues only two of them: whether the trial court erred in admitting evidence of John's police interview in violation of Reyos's constitutional right to confrontation and whether the applicable sentencing scheme is constitutional.[5] "Whether testimony was admitted in violation of [Reyos's] right to confrontation is a question of law," which we review for correctness. *State v. Calliham*, 2002 UT 87, ¶ 31, 57 P.3d 220. The second issue was not preserved, but Reyos asserts this court may consider it under the exceptional circumstances exception to the preservation requirement.

¶12    The State contends the second issue does not present exceptional circumstances, and therefore we should decline to review it. In the State's view, Reyos cannot make an exceptional circumstances claim because he could have raised the issue

---

4. "Criminal homicide constitutes aggravated murder if the actor intentionally or knowingly causes the death of another [and] . . . the actor was previously convicted of . . . aggravated robbery." Utah Code Ann. § 76-5-202(1)(j)(xvi) (LexisNexis Supp. 2016).

5. Reyos also challenged the sufficiency of the evidence to support his conviction of aggravated murder but conceded this issue at oral argument.

below but simply chose not to pursue it. The State relies on *State v. Holgate*, 2000 UT 74, 10 P.3d 346, in which our supreme court stated, "[A] defendant should not be permitted to forego making an objection with the strategy of enhanc[ing] the defendant's chances of acquittal and then, if that strategy fails, . . . claim[ing] on appeal that the Court should reverse." *Id.* ¶ 11 (alterations and omission in original) (citation and internal quotation marks omitted).

¶13 Irrespective of the State's argument, under rule 22(e) of the Utah Rules of Criminal Procedure, "[t]he court may correct an illegal sentence, or a sentence imposed in an illegal manner, at any time." Utah R. Crim. P. 22(e) (2016). And, as our supreme court has explained, constitutional challenges to a defendant's sentence "fall[] within the narrow scope of rule 22(e)'s exception to the preservation of claims," so long as such challenges "attack the sentence itself and not the underlying conviction, and . . . do so as a facial challenge rather than an as-applied inquiry." *State v. Houston*, 2015 UT 40, ¶¶ 16, 26, 353 P.3d 55 (footnote omitted). Reyos's constitutional claims meet that standard, and we therefore "treat [his] claims as if they had been preserved." *See id.* ¶ 16. Whether a statute is unconstitutional is a question of law reviewed for correctness. *State v. Poole*, 2010 UT 25, ¶ 8, 232 P.3d 519.

ANALYSIS

I. Admissibility of John's Out-of-Court Statements

¶14 Reyos contends the admission of John's out-of-court statements violated his Sixth Amendment right of confrontation because John had "absolutely no memory" of his interview with police. In Reyos's view, John's "amnesia" made him unavailable because defense counsel could not meaningfully examine him about his out-of-court statements. We disagree.

¶15  The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court discussed the contours of the Confrontation Clause in the landmark case *Crawford v. Washington*, 541 U.S. 36 (2004), and specifically addressed whether the rule it had articulated in *Ohio v. Roberts*, 448 U.S. 56 (1980), strayed "from the original meaning of the Confrontation Clause." *Crawford*, 541 U.S. at 42.

¶16  In *Roberts*, the Court held that out-of-court statements of unavailable witnesses may be admitted if they bear "adequate indicia of reliability." 448 U.S. at 66 (internal quotation marks omitted). To meet the *Roberts* test, the evidence must "fall[] within a firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." *Id.*; *accord Crawford*, 541 U.S. at 40.

¶17  The *Crawford* court concluded that the *Roberts* test was "unpredictable and inconsistent," explaining that "the result below is so improbable that it reveals a fundamental failure on our part to interpret the Constitution in a way that secures its intended constraint on judicial discretion." *Id.* at 66–67. The Court articulated a new test, stating that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68. We emphasize that the *Crawford* test is triggered by testimonial statements only. *See id.* ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford States flexibility in their development of hearsay law . . . as would an approach that exempted such statements from Confrontation Clause scrutiny altogether."). Although the Court did not define "testimonial," it stressed that, at a minimum, the term applies to "prior testimony

at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."[6] *Id.*

¶18 Reyos contends John was unavailable for purposes of the Confrontation Clause. He argues, "'[A] witness's total amnesia concerning a prior statement will often make him not subject to cross-examination' for Confrontation Clause purposes." (Quoting *United States v. DiCaro*, 772 F.2d 1314, 1323 (7th Cir. 1985).) But the *DiCaro* court made this statement while analyzing whether the grand jury testimony of a witness claiming amnesia could be admitted under the Federal Rules of Evidence, not under the Confrontation Clause. 772 F.2d at 1321–23. Moreover, the concept of unavailability under the Confrontation Clause differs from the concept under both the Utah and Federal Rules of Evidence.[7]

---

6. As it relates to statements made under police interrogation, the United States Supreme Court has clarified that

> [s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006).

7. Utah adopted the Federal Rules of Evidence in 1977. Utah R. Evid. Preliminary Note. "The numbering and text of these rules conform to the Federal Rules of Evidence . . . except . . . in a small number of instances in which the [state] rule adopted was considered sufficiently superior to the federal rule to justify

(continued…)

¶19    Unavailability under the Confrontation Clause is narrow and literal. A witness is unavailable if he does not testify but is available if he does.[8] S*ee Crawford*, 541 U.S. at 53–54, 59 n.9 (stating that "the Framers would not have allowed admission of testimonial statements of a witness who did not *appear* at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination," and that "[t]he Clause does not bar admission of a statement so long as the declarant is *present* at trial to defend or explain it" (emphases added)); *see also California v. Green*, 399 U.S. 149, 161 (1970) ("[W]e note that none of our decisions interpreting the Confrontation Clause requires excluding the out-of-court statements of a witness who is available and testifying at trial."). And where a witness is available, his testimonial statements are admissible and do not violate the Confrontation Clause.[9]

(…continued)
departure from the objective of uniformity between Utah and federal rules." *Id.* The criteria for being unavailable under rule 804(a) of the Utah Rules of Evidence does not differ in any material way from the criteria outlined in rule 804(a) of the Federal Rules of Evidence. Accordingly, federal cases applying the federal version of rule 804(a) are instructive to our analysis.

8. A witness will not be deemed unavailable unless the prosecution has "made a good-faith effort to obtain [the witness's] presence at trial." *Barber v. Page*, 390 U.S. 719, 724–25 (1968).

9. "[T]he history surrounding the right to confrontation supports the conclusion that it was developed to target particular practices that occurred under the English bail and committal statutes passed during the reign of Queen Mary" in which statements from ex parte examinations were used "'as evidence against the accused.'" *Davis v. Washington*, 547 U.S. 813, 835

(continued…)

*Crawford*, 541 U.S. at 59 n.9 ("[W]hen the declarant *appears* for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." (emphasis added)).

¶20    By contrast, the concept of unavailability under the Utah Rules of Evidence and their federal counterpart is much broader. For example, a witness may be deemed unavailable despite appearing and testifying at trial if he cannot remember the events at issue. *See* Utah R. Evid. 804(a)(3). Thus, a witness may be deemed available for purposes of confrontation but simultaneously unavailable under the Utah Rules of Evidence. This might occur where a witness at trial claims a loss of memory as to the subject matter of the testimony he gave at a preliminary hearing in the same case.

¶21    Reyos relies on cases analyzing unavailability under the Utah and Federal Rules of Evidence to support his contention that John was unavailable for purposes of the Confrontation Clause. In addition, Reyos makes the bald assertion that, because John claimed no memory of speaking with him about the murder or making a statement to the police, he "was deprived of his right of the 'face-to-face' confrontation." But the cases he cites do not support his argument, and in any event, the Confrontation Clause is not triggered where, as here, "the declarant is present at trial to defend or explain" his statement. *Crawford*, 541 U.S. at 59 n.9; *Green*, 399 U.S. at 162 ("For where the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the

_____

(…continued)
(2006) (Thomas, J., concurring) (quoting *Crawford v. Washington*, 541 U.S. 36, 43, 50 (2004)). "These examinations came to be used as evidence in some cases, in lieu of a personal appearance by the witness." *Id.* at 836.

conclusion that the admission of his out-of-court statements does not create a confrontation problem.").

¶22 Reyos further asserts, "there was no 'meaningful cross-examination' because the defense was unable to elicit any testimony regarding the surrounding circumstances or the actual event, to test whether the witness's statement was factually accurate." But the Confrontation Clause "guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Owens*, 484 U.S. 554, 559 (1988) (citation and internal quotation marks omitted). And where a witness testifies that he cannot recall making a prior statement or the events surrounding it, "[i]t is sufficient that the defendant has the opportunity to bring out such matters as the witness'[s] bias, his lack of care and attentiveness, his poor eyesight, and even . . . the very fact that he has a bad memory." *Id.* "The weapons available to impugn the witness'[s] statement when memory loss is asserted will of course not always achieve success, but successful cross-examination is not the constitutional guarantee. They are, however, realistic weapons . . . ." *Id.* at 560.

¶23 Indeed, Reyos, through counsel, could have inquired about whether John was under the influence of drugs or alcohol at the time he spoke with Reyos and the police, which, if true, could have undermined the veracity of John's statements to the police and provided an explanation for John's inability to remember them. Reyos did not pursue such questioning, but it is sufficient that he had the opportunity to do so. *See id.* at 559–60. Reyos did, however, ask John whether he remembered speaking with him or the police, and the jury was able to observe John's demeanor and assess his truthfulness.

¶24 Although the Supreme Court determined in *Owens*, a post-*Roberts* but pre-*Crawford* decision, that a witness's lack of memory, without more, does not violate the Confrontation

Clause, *see id.*, Reyos argues, it "is unknown" how the Supreme Court would decide *Owens* in light of *Crawford*. But *Crawford* did not overrule *Owens*. Indeed, the *Owens* court did not apply the *Roberts* test, and it rejected the idea that "such an inquiry is called for when a hearsay declarant is present at trial and subject to unrestricted cross-examination. In that situation, as the Court recognized in *Green*, the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness'[s] demeanor satisfy the constitutional requirements." *Id.* at 560. We therefore conclude that under *Owens* and *Crawford*, Reyos's right to confrontation was not violated.

¶25    In passing, Reyos also argues John was unavailable under rule 804 of the Utah Rules of Evidence, which outlines several exceptions to the hearsay rule, but he does not explain how rule 804 applies to John's statements to police. Rule 804(b)(1) governs *prior testimony* "given as a witness at a trial, hearing, or lawful deposition," circumstances in which the prior testimony is subject to cross-examination. Utah R. Evid. 804(b)(1)(A). John's statements, however, do not fall under the purview of rule 804(b)(1). They fall under rule 801, which provides that where a "declarant testifies and is subject to cross-examination *about a prior statement*, and the statement: (A) is inconsistent with the declarant's testimony or the declarant denies having made the statement or has forgotten," the statement is not hearsay. *Id.* R. 801(d)(1)(A) (emphasis added). Accordingly, John's statements were not hearsay, and therefore Reyos's rule 804 argument fails.

¶26    In sum, we conclude John was available for Confrontation Clause purposes and the trial court therefore properly admitted his out-of-court statements.

## II. Constitutionality of Utah's Aggravated Murder Sentencing Scheme

¶27    Reyos contends the aggravated murder sentencing scheme under Utah Code sections 76-3-207 and 76-3-207.7

violates the Due Process Clause of the United States Constitution and the Utah Constitution, the Uniform Operations of Laws Clause of the Utah Constitution, and the Equal Protection Clause of the United States Constitution. Reyos's contentions mirror arguments our supreme court has recently rejected in *State v. Met*, 2016 UT 51, 388 P.3d 447; *State v. Houston*, 2015 UT 40, 353 P.3d 55; and *State v. Perea*, 2013 UT 68, 322 P.3d 624.

¶28 The Utah Code provides prosecutors two alternatives when charging a person with aggravated murder. The prosecutor may seek the death penalty, in which case the aggravated murder is charged as a "capital felony." Utah Code Ann. § 76-5-202(3)(a) (LexisNexis Supp. 2016). Alternatively, the aggravated murder is charged as a "noncapital first degree felony." *Id.* § 76-5-202(3)(b). Sentencing differs under each alternative.

¶29 Defendants who plead guilty to or are convicted of capital aggravated murder are sentenced by a jury.[10] *Id.* § 76-3-207(1)(c)(i). The jury must first consider whether to impose the death penalty and may only do so by a unanimous vote. *Id.* § 76-3-207(5)(a). Before imposing the death penalty, the jury must consider "the totality of the aggravating and mitigating circumstances," must be "persuaded beyond reasonable doubt that total aggravation outweighs total mitigation," and must be further persuaded beyond reasonable doubt "that the imposition of the death penalty is justified and appropriate in the circumstances." *Id.* § 76-3-207(5)(b). "If the jury is unable to reach a unanimous decision imposing the sentence of death, the jury shall then determine whether the penalty of life in prison without parole shall be imposed," which requires agreement by

10. A defendant may, with the court's and the prosecutor's consent, waive sentencing by jury and instead be sentenced by the court. Utah Code Ann. § 76-3-207(1)(c)(i) (LexisNexis Supp. 2016).

at least ten jurors. *Id.* § 76-3-207(5)(c). "The penalty of life in prison without parole shall only be imposed if the jury determines that the sentence . . . is appropriate." *Id.* If the jury decides not to impose a sentence of life in prison without parole, "the court shall discharge the jury and impose an indeterminate prison term of not less than 25 years and which may be for life." *Id.*

¶30 Defendants who, like Reyos, plead guilty to or are convicted of noncapital aggravated murder "shall be sentenced by the court." *Id.* § 76-3-207.7(1). "The sentence under this section shall be: (i) life in prison without parole; or (ii) an indeterminate prison term of not less than 25 years and which may be for life." *Id.* § 76-3-207.7(2)(a). Although section 207.7 does not articulate a standard that must be met before imposing a sentence of life in prison without parole, such as requiring the sentence to be "appropriate" as is the case under section 207, our supreme court has stated that section 207.7 "must be read in the context of Utah's sentencing scheme as a whole." *Perea*, 2013 UT 68, ¶ 115; *accord Met*, 2016 UT 51, ¶ 42. And the criminal code "'shall be construed . . . [to p]revent arbitrary or oppressive treatment'" and to impose "'penalties which are proportionate to the seriousness of offenses.'" *Perea*, 2013 UT 68, ¶ 115 (alteration and ellipsis in original) (quoting Utah Code § 76-1-104); *accord Met*, 2016 UT 51, ¶ 42.

¶31 In short, a defendant convicted of capital aggravated murder will receive one of three sentences under section 207: the death penalty, life in prison without parole, or an indeterminate sentence of twenty-five years to life. *See* Utah Code Ann. § 76-3-207(5) (LexisNexis Supp. 2016). And a defendant convicted of noncapital aggravated murder will receive one of two sentences under section 207.7: life in prison without parole or an indeterminate sentence of twenty-five years to life. *See id.* § 76-3-207.7(2).

A.      Due Process Challenges

¶32     Reyos contends Utah's aggravated murder sentencing scheme violates the Due Process Clause of the United States Constitution and the Utah Constitution because it allows the sentencing court rather than the jury to impose a sentence of life in prison without parole. Reyos argues that, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 133 S. Ct. 2151 (2013), the sentencing scheme is unconstitutional.

¶33     In *Apprendi*, the Supreme Court explained that the right to due process under the Fifth Amendment and the right to an impartial jury under the Sixth Amendment, "[t]aken together, . . . indisputably entitle a criminal defendant to a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." 530 U.S. at 476–77 (second alteration in original) (citation and internal quotation marks omitted). In light of these rights, the Court held unconstitutional a New Jersey statute that authorized a sentencing court to impose a sentence beyond the statutory maximum if the judge determined, by a preponderance of the evidence, the defendant committed a hate crime. *Id.* at 468–69, 497. The Court stated, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. Confronting a similar situation in *Alleyne*, the Court held that any fact that would "increase the *mandatory minimum* sentence . . . must be submitted to the jury and found beyond a reasonable doubt." 133 S. Ct. at 2158.

¶34     In Reyos's view, section 207.7 runs afoul of *Apprendi* and *Alleyne* because, as he claims, it authorizes the sentencing court to "increase" the mandatory minimum sentence by imposing a sentence of life in prison without parole rather than an indeterminate sentence of twenty-five years to life, and such an

increase "must be based upon a jury determination of the facts supporting the increase." We are unpersuaded by this argument.

¶35    In *State v. Houston*, 2015 UT 40, 353 P.3d 55, our supreme court reviewed a similar *Apprendi* challenge. *Id.* ¶¶ 30–32. There, the defendant argued section 207 was unconstitutional under *Apprendi*. *Id.* The court noted that, unlike the statute at issue in *Apprendi*, section 207 does not require or authorize the sentencing court "to make factual findings that increase an offender's sentence." *Id.* ¶ 32. Section 207.7 similarly does not require or authorize the sentencing court to make a factual finding that would increase the statutory maximum sentence. *See* Utah Code Ann. § 76-3-207.7. Notwithstanding this precedent, Reyos argues *Alleyne*'s extension of *Apprendi*'s rule to prohibit imposing a sentence increasing the mandatory minimum sentence renders section 207.7 unconstitutional. But, like section 207, section 207.7 does not require or authorize the sentencing court to increase the mandatory minimum sentence—in this case, not less than twenty-five years in prison. *See id.* Rather, section 207.7 provides the court with two alternative sentences—life without parole or twenty-five years to life—and identifies no factual finding that is pertinent to the court's decision between the two. *See id.*

¶36    In any event, the Supreme Court noted in *Apprendi*, "We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion . . . in imposing a judgment *within the range* prescribed by statute." 530 U.S. at 481. This is precisely what the sentencing court did. We conclude *Apprendi* and *Alleyne* do not apply, and therefore there is no violation under the United States Constitution.

¶37    Reyos further contends the Utah Constitution provides "even broader due process and jury trial protections than the federal protections announced in *Apprendi*." But Reyos has not "adequately analyzed the state constitutional claim as an issue separate and distinct from its federal counterpart," and we

therefore do not address it. *See State v. Rynhart*, 2005 UT 84, ¶ 12, 125 P.3d 938.

¶38 Reyos next contends Utah's aggravated murder sentencing scheme violates due process because it is "arbitrary and capricious." As we understand it, Reyos argues that, if the State had sought to convict him of capital aggravated murder, thus subjecting him to be sentenced by a jury under section 207, he may have obtained a more lenient sentence. Reyos further argues that, because sentencing under section 207 may be "potentially [more] lenient" and "arguably more favorable to a defendant than [section] 207.7," section 207 "should be utilized."

¶39 In support of his argument, Reyos cites *State v. Shondel*, 453 P.2d 146 (Utah 1969), which holds that "where there is doubt or uncertainty as to which of two punishments is applicable to an offense an accused is entitled to the benefit of the lesser." *Id.* at 148. Reyos does not claim Utah's aggravated murder sentencing scheme creates uncertainty as to what sentence may be imposed on a defendant, nor do we believe there is any ambiguity. Once the State charged Reyos with noncapital aggravated murder, it was clear that if Reyos were to be convicted, he would either be sentenced to life in prison without parole or an indeterminate sentence of twenty-five years to life. Thus, we are not persuaded that a purely conjectural possibility that a jury might sentence more leniently than a judge implicates *Shondel* in any way.

¶40 We conclude Utah's aggravated murder sentencing scheme does not violate the Due Process Clause of the United States Constitution or the Utah Constitution.

B.    Challenges Under the Utah Uniform Operation of Laws Clause and the Equal Protection Clause

¶41 Reyos contends Utah's aggravated murder sentencing scheme violates the Uniform Operation of Laws Clause of the

Utah Constitution and the Equal Protection Clause of the United States Constitution because, in his view, it "divides a class of similarly situated people into two subclasses who will receive disparate treatment." Reyos's contention is rooted in the differences between sentencing defendants charged with capital aggravated murder under section 207 and defendants charged with noncapital aggravated murder under section 207.7.

¶42    The Uniform Operation of Laws Clause provides, "All laws of a general nature shall have uniform operation." Utah Const. art. 1, § 24. "The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *State v. Lafferty*, 2001 UT 19, ¶ 70, 20 P.3d 342 (quoting U.S. Const. amend. XIV, § 1). "[B]oth the federal and state constitutions require that similarly situated individuals be treated alike under the law unless there is a reasonable basis for treating them differently." *State v. Met*, 2016 UT 51, ¶ 48, 388 P.3d 447 (citation and internal quotation marks omitted). Critical to this appeal, a law must apply equally "to all members within each class or subclass," and "the statutory classifications and the different treatment given the classes must be based on differences that have a reasonable tendency to further the objectives of the statute." *State v. Mohi*, 901 P.2d 991, 997–98 (Utah 1995) (citations and internal quotation marks omitted).

¶43    Reyos takes issue with the fact that defendants convicted of capital aggravated murder under section 207 are sentenced by a jury, whereas defendants convicted of noncapital aggravated murder under section 207.7 are sentenced by a court. Our supreme court rejected this argument in *Met*.

¶44    Reyos's argument fails, in part, because those sentenced under section 207.7 are not similarly situated to those sentenced under section 207 in that they do not belong to the same class. One group is composed of those who are charged with capital

offenses and the other is composed of those charged with noncapital offenses. *See Met*, 2016 UT 51, ¶ 51. Indeed, separate statutes govern the sentencing process for each type of offense. Moreover, "[b]ecause the death penalty is different, in both a factual and legal sense, from life without parole, the Legislature has a reasonable basis for treating those facing the death penalty differently than those who are not." *Id.*

¶45   To the extent Reyos makes individual arguments that sections 207 and 207.7 independently violate Utah's Uniform Operation of Laws Clause, we reject those arguments on vertical stare decisis grounds.

¶46   In *State v. Perea*, 2013 UT 68, 322 P.3d 624, our supreme court rejected a claim that section 207.7 violated Utah's Uniform Operation of Laws Clause because it authorized the sentencing court to impose either life in prison without parole or an indeterminate prison sentence of twenty-five years to life. *Id.* ¶ 122. There, the court held:

> Not all those found guilty of aggravated murder are similarly situated. While all are found guilty of the same crime, each case and each defendant presents a different set of facts and a different combination of aggravating and mitigating factors. The discretion afforded to district courts furthers the legitimate legislative purpose of sentencing offenders based on the totality of the unique circumstances present in each case.

*Id.* ¶ 123. Since *Perea*, the supreme court has twice affirmed this holding. *See Met*, 2016 UT 51, ¶ 43; *State v. Reece*, 2015 UT 45, ¶¶ 77–80, 349 P.3d 712.

¶47   Similarly, in *State v. Houston*, 2015 UT 40, 353 P.3d 55, our supreme court rejected a claim that section 207 violated the Uniform Operation of Laws Clause because it authorizes a jury

to sentence one offender "to life with parole and sentence the other to life without parole." *Id.* ¶¶ 42–46. There, the court explained:

> Although it is true that two defendants who commit aggravated murder may receive different sentences from a jury, this is either because the defendants were not similarly situated (for example, one defendant committed a much more heinous crime) or the jury in the course of its deliberations finds it more "appropriate" to sentence one defendant to a more lenient or more severe penalty.

*Id.* ¶ 45. The court concluded section 207 does not violate the Uniform Operation of Laws Clause because it "treats all similarly situated defendants the same and it does not contain any impermissible classifications." *Id.* ¶ 46.

¶48 We thus conclude sections 207 and 207.7, taken together or independently, do not violate the Uniform Operation of Laws Clause of the Utah Constitution. And because we conclude they survive scrutiny under the Utah Constitution, we also conclude they survive scrutiny under the Equal Protection Clause of the United States Constitution. *Id.* ¶ 41.

CONCLUSION

¶49 We affirm Reyos's convictions. The trial court properly admitted John's out-of-court statements at trial. We also reject each of Reyos's constitutional challenges to Utah's aggravated murder sentencing scheme.

———————