**2018 UT App 156**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DANNY LEROY LOGUE,
Appellant.

Opinion
No. 20151092-CA
Filed August 16, 2018

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 111401543

Herschel Bullen, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN M. HARRIS and DIANA HAGEN concurred.

ORME, Judge:

¶1     Defendant Danny Leroy Logue appeals his convictions for aggravated murder, a noncapital first degree felony, *see* Utah Code Ann. § 76-5-202(3)(b) (LexisNexis 2017); possession of a firearm by a restricted person, a second degree felony, *see id.* § 76-10-503(2)(a); and obstruction of justice, a second degree felony, *see id.* § 76-8-306(3)(a). We affirm.[1]

---

1. This appeal is the latest chapter in an ongoing saga concerning an act of retaliation against a suspected informant. *See generally Logue v. Court of Appeals*, 2016 UT 44, ¶ 7, 387 P.3d 976 (denying Logue's petition for extraordinary relief); *State v. Morris*, 2017 UT App 112, ¶ 19, 400 P.3d 1183 (affirming the contempt

(continued…)

BACKGROUND

*The Shooting*

¶2     Early in the morning on May 16, 2011, a man (Victim) was discovered in the driveway of his home suffering from a gunshot wound to his head.[2] Victim had been lying in his driveway for more than four hours before his mother and sister found him. Victim was transported to a hospital and later died.

¶3     Two months prior to Victim's death, police officers executed a search warrant on a storage unit owned by Yuri Lara, a drug dealer who sold and transported drugs with Victim. Officers discovered drugs and drug paraphernalia in the storage unit, and Lara was arrested. Lara immediately suspected that Victim had shared information with police officers because, during the search, officers went directly to drug paraphernalia that Lara assumed only Victim knew about.

¶4     Soon after the search, Lara approached one of his customers (Customer) and asked Customer if he knew of anyone willing to "beat somebody up." Customer introduced Lara to Darrell Wayne Morris, who agreed to assault Victim in exchange for one ounce of methamphetamine from Lara, which at that time was valued at $1200. Lara gave Morris half of the methamphetamine upfront and showed Morris where Victim

_____

(…continued)
adjudication of Darrell Wayne Morris, Logue's co-defendant, for Morris's refusal to testify at Logue's trial).

2. "In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict. We recite the facts accordingly." *State v. Boyd*, 2001 UT 30, ¶ 2, 25 P.3d 985 (citation and internal quotation marks omitted).

lived. Morris then solicited Logue's help, as both were members of the same gang.

¶5    On the day before Victim's death, Logue gave his girlfriend (Girlfriend) money to buy .38 caliber ammunition from Walmart. When Girlfriend returned from Walmart with the ammunition, she found Logue with Morris and a friend (Friend). All four of them spent the day together at Girlfriend's trailer home, and, around 2:00 a.m., Logue and Morris left, telling Girlfriend and Friend that they were going "to go beat somebody up." Friend noticed that Logue had a gun and suggested that he leave it. Logue replied that he needed it for protection.

¶6    Once Logue and Morris reached Victim's house, they found Victim sitting on the porch with his cell phone in hand. Upon seeing Morris and Logue, Victim stood up and tried to make a call. But Logue shot Victim before he could successfully dial. Lara, in the meantime, had been staying with Customer on the night of Victim's death. Several hours after the shooting, Lara learned of Victim's death and Customer recalled seeing Lara do a "little jig" while exclaiming, "[Victim's] dead." Customer and Lara parted ways, and Customer returned home that afternoon to find Morris and Friend looking to collect the remaining methamphetamine. Customer asked Morris if he had seen Victim and Morris replied, "[W]ell let's just say he's not going to testify." Morris left without the other half-ounce of methamphetamine, but Morris and Friend met Lara two days later and collected it. Morris and Friend then returned to Girlfriend's trailer. Morris and Logue went into one of the bedrooms for fifteen to twenty minutes, and when they emerged, Morris had less methamphetamine than he did before entering the bedroom.

*The Investigation*

¶7    Officers questioned Lara once they suspected his involvement, and his alibi led them to Customer. Customer then

pointed them towards Morris and Logue. There was very little physical evidence, however, to connect Logue to Victim's death because officers were unable to recover the weapon used to kill Victim. Although phone records showed that Morris's phone was used near Victim's house at the time of the shooting, and that, from May 14, 2011, to May 22, 2011, 126 calls were made between Lara's and Morris's phones, most of the State's evidence came from witnesses with knowledge of Logue's involvement in the shooting. For example, Girlfriend testified that Logue admitted to her that he shot Victim, and Friend testified that Morris told her it was Logue who shot Victim.

¶8    Declining to seek the death penalty, the State charged Logue with one count of aggravated murder, a noncapital first degree felony. *See* Utah Code Ann. § 76-5-202(3)(b) (LexisNexis 2017). Invoking five aggravating circumstances to support the elevated murder charge, the State asserted that Logue killed Victim: (1) "for pecuniary gain"; (2) "pursuant to an agreement or contract for remuneration or the promise of remuneration"; (3) to prevent him from testifying; (4) to prevent him from "providing evidence or participating in any legal proceedings or official investigation"; and (5) to retaliate against him "for testifying, providing evidence or participating in any legal proceedings or official investigation." *Id.* § 76-5-202(1)(g)–(h), (k).

*The Trial*

¶9    During opening statements, Logue's trial counsel declared that there was no physical evidence tying Logue to Victim's murder. But on the fourth day of trial, the State sought to enter into evidence a duplicate receipt obtained from Walmart, dated the day before the murder. Officers learned of the possible existence of such a document from Girlfriend's admission that, the day before the murder, she had purchased ammunition at Walmart for Logue. But Girlfriend did not admit this to officers until three years after the murder, approximately five months before trial. Officers did not follow up on this information until trial, and upon visiting the Walmart from

which Girlfriend claimed to have purchased the ammunition, officers obtained a copy of a receipt for the sale of .32 caliber ammunition at that Walmart on the day before the murder. Because the receipt memorialized a cash transaction, it contained no information bearing on who had purchased the ammunition.

¶10 When the receipt was finally shared with the State, it sought to introduce the receipt into evidence. Defense counsel objected. Agreeing that defense counsel should be given time to investigate the receipt, the trial court delayed Girlfriend's testimony until the seventh day of trial. After Girlfriend's testimony, defense counsel again challenged the admissibility of the receipt because of the State's failure to disclose the receipt until midtrial. Claiming that the admission of the receipt violated the State's duty to timely disclose all evidence and unfairly prejudiced Logue, defense counsel requested that either the receipt be excluded or there be a continuance or mistrial. The court denied defense counsel's motions and ruled that the State had properly disclosed the receipt once it had been discovered.

¶11 After the State rested its case, defense counsel moved for a directed verdict, arguing that there was insufficient evidence to support an aggravated murder charge. The trial court denied the motion. A jury convicted Logue on all charges, and he now appeals.

ISSUES AND STANDARDS OF REVIEW

¶12 Logue first contends that the trial court erred in denying his motion for a directed verdict because there was insufficient evidence to support the aggravating factors underlying his murder conviction. Because a trial court's ruling on a motion for a directed verdict presents a question of law, we review it for correctness, "giving no particular deference to the trial court's legal conclusions." *State v. Hirschi*, 2007 UT App 255, ¶ 15, 167 P.3d 503 (citation and internal quotation marks omitted). And in reviewing a trial court's denial of a motion for a directed verdict

on the basis of insufficient evidence, "we will uphold the trial court's decision if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183 (brackets, citation, and internal quotation marks omitted).

¶13 Logue next contends the Walmart receipt was unfairly prejudicial and, therefore, that the trial court erred in admitting the receipt and in denying his motion for a new trial. We review the admission of the receipt for an abuse of discretion. *See State v. Calliham*, 2002 UT 86, ¶¶ 23–24, 55 P.3d 573. When we review evidentiary rulings, we do so "with deference to the trial court based on the presumption that the trial judge, having personally observed the quality of the evidence, the tenor of the proceedings, and the demeanor of the parties, is in a better position to perceive the subtleties at issue than we can looking only at the cold record." *Id.* ¶ 23. A trial court's denial of a motion for a new trial is also reviewed for an abuse of discretion. *State v. Pinder*, 2005 UT 15, ¶ 20, 114 P.3d 551.

¶14 Finally, Logue challenges the constitutionality of the sentencing scheme in Utah Code sections 76-3-207.7 and 76-5-202. We review decisions concerning the constitutionality of statutes for correctness. *State v. Reece*, 2015 UT 45, ¶ 18, 349 P.3d 712.

## ANALYSIS

### I. Sufficiency of the Evidence

¶15 Logue argues on appeal that there is insufficient evidence in the record to support the factors underlying his aggravated murder conviction. At oral argument, he narrowed this argument by asserting that the evidence supports a conviction for aggravated assault but not aggravated murder. In effect,

Logue challenges his aggravated murder conviction on the grounds that there is insufficient evidence to support (1) that he had the requisite intent for murder and (2) that he committed the murder for one or more of the reasons supporting his aggravated murder conviction.

¶16    To be convicted of aggravated murder, the State had to prove beyond a reasonable doubt that Logue "intentionally or knowingly cause[d] the death of [Victim]." *See* Utah Code Ann. § 76-5-202(1) (LexisNexis 2017).[3] The State therefore had to show either that it was Logue's "conscious objective or desire to engage in the conduct or cause the result," or that he was "aware of the nature of his conduct or the existing circumstances." *Id.* § 76-2-103(1)–(2).

¶17    "It is well established that intent can be proven by circumstantial evidence." *State v. James*, 819 P.2d 781, 789 (Utah 1991). Because intent is "a state of mind, which is rarely susceptible of direct proof, it can be inferred from conduct and attendant circumstances in the light of human behavior and experience." *State v. Robertson*, 2005 UT App 419, ¶ 15, 122 P.3d 895 (citation and internal quotation marks omitted). "When intent is proven by circumstantial evidence, we must determine (1) whether the State presented any evidence that [the defendant] possessed the requisite intent, and (2) whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove that [the defendant] possessed the requisite intent." *State v. Holgate*, 2000 UT 74, ¶ 21, 10 P.3d 346 (citation and internal quotation marks omitted).

---

3. In 2017, the Utah Legislature amended the aggravated murder statute; however, those amendments did not materially alter the sections referenced in this opinion, and we therefore cite to the most recent version of the Code for convenience.

¶18 The State presented evidence that Logue brought a gun with him to Victim's house, that Logue and Morris confessed to others that Logue shot Victim after he saw Victim trying to dial his phone, and that Victim's body showed a gunshot wound but no signs of an assault of less severity. Although there was some direct evidence that Logue's *initial* intent was to assault Victim, the jury could have reasonably concluded that it was ultimately Logue's conscious objective to shoot Victim, given that he took a gun to Victim's house and shot Victim upon seeing him attempt to place a call. Accordingly, there is sufficient evidence to support the jury's determination that Logue had the requisite intent for murder.

¶19 Logue also contends that there is insufficient evidence to support the aggravating factors that he killed Victim in retaliation and to prevent him from participating or testifying in any legal proceeding or investigation.[4] Section 76-5-202 elevates

---

4. Logue also argues that there is insufficient evidence to support the aggravating factor that he committed the homicide for pecuniary gain. *See* Utah Code Ann. § 76-5-202(1)(g) (LexisNexis 2017). At oral argument, both parties conceded that the jury needed to find only one aggravating factor for an aggravated murder conviction, and our opinion focuses on the three factors considered in the body of the opinion. Even so, we conclude that there is also sufficient evidence to determine that Logue killed Victim for pecuniary gain. While Logue contends that the agreement to beat up Victim was based on gang affiliation rather than the promise of methamphetamine, there is evidence that he was promised methamphetamine for helping Morris. Two days after Victim's murder, Morris and Friend went to collect the half-ounce of methamphetamine from Lara. After collecting the payment, they returned to Girlfriend's trailer. Morris and Logue took the methamphetamine and went into one of the bedrooms. After fifteen minutes or so, they reappeared and Morris had less methamphetamine than when he went into the bedroom. It would have been reasonable for a jury to

(continued…)

murder to aggravated murder when, inter alia, "the homicide was committed for the purpose of: (i) preventing a witness from testifying; (ii) preventing a person from providing evidence or participating in any legal proceedings or official investigation; [or] (iii) retaliating against a person for testifying, providing evidence, or participating in any legal proceedings or official investigation[.]" Utah Code Ann. § 76-5-202(1)(k)(i)–(iii).

¶20    When reviewing a sufficiency of the evidence claim, we consider "whether a jury could, based on the evidence, make an inference to support a guilty verdict, or whether the guilty verdict rests upon mere speculation." *Salt Lake City v. Howe*, 2016 UT App 219, ¶ 10, 387 P.3d 562. Inferences may be drawn from direct or circumstantial evidence, but they "'must be more than speculation and conjecture to be reasonable.'" *Id.* ¶ 11 (quoting *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995)). And "the difference between an inference and speculation depends on whether the underlying facts support the conclusion. A jury draws a reasonable inference if there is an evidentiary foundation to draw and support the conclusion." *Salt Lake City v. Carrera*, 2015 UT 73, ¶ 12, 358 P.3d 1067. We therefore review the evidence and all reasonable inferences in a light most favorable to the jury's verdict. *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183.

¶21    Logue asserts that the evidence supports his claim that he only intended to assault Victim. But the evidence and all reasonable inferences demonstrate that Victim was killed in retaliation for "snitching" to police and to prevent Victim from cooperating with police or testifying. And Logue concedes that the evidence in this case at least demonstrates that he and Morris "were going to beat [Victim] up for being a snitch."

_____

(…continued)
infer that Logue and Morris agreed to share the payment of methamphetamine—valued at $1200 and thus constituting a pecuniary gain—for harming Victim.

Additionally, when Customer asked about Victim after the shooting, Morris stated, "[W]ell let's just say he's not going to testify." It therefore would not have been mere speculation for the jury to infer that Logue shot Victim for the same reason that he was planning to assault Victim, namely, to prevent him from testifying. We conclude there is sufficient evidence to support the jury's finding that Logue committed the murder to prevent Victim from testifying, to prevent Victim from providing evidence or participating in any legal proceeding or official investigation, and to retaliate against Victim for providing evidence to officers that led to the search of Lara's storage unit. Because there was sufficient evidence to support the aggravating factors relied on by the State, it follows that the trial court did not err in denying the motion for a directed verdict.

## II. Admitting the Receipt into Evidence

¶22    Logue contends that the trial court abused its discretion in admitting a copy of the Walmart receipt and in denying him a new trial because the receipt's prejudicial effect outweighed its probative value.[5] We note at the outset that the receipt's importance seems quite minimal in evidentiary terms. Logue never denied that Girlfriend bought him ammunition. And whatever the source of the ammunition, the most damning evidence was that Logue confessed to others that he shot Victim the moment he saw him stand up, cell phone in hand and poised to make a call. Logue concedes that the receipt had at least some probative value because it helped strengthen Girlfriend's testimony that she purchased ammunition for him prior to the

---

5. In his brief, Logue also argued that the admission of the receipt lacked relevance, but, at oral argument, he narrowed this issue solely to the prejudicial effect of the receipt. He further argued that the admission of the receipt violated his due process right to a fair trial. He offers no support for this assertion other than arguing that a constitutional error is not a harmless error. We therefore decline to address these issues.

shooting. However, he argues that admission of the receipt undermined defense counsel's credibility with the jury because, during his opening statement, defense counsel asserted that "there was no physical evidence linking Logue to the murder."[6] And he claims that the appearance of the receipt portrayed defense counsel as "disingenuous," resulting in unfair prejudice towards Logue because of his counsel's inaccurate statement.

¶23    Under rule 403 of the Utah Rules of Evidence, a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." In reviewing a trial court's admission of evidence, "we indulge a presumption in favor of admissibility." *State v. Dunn*, 850 P.2d 1201, 1221–22 (Utah 1993). Because all evidence is in a sense prejudicial and "damaging to the party against whom it is offered," "the rule only requires that the trial court measure the danger the evidence poses of causing *unfair* prejudice to a defendant." *State v. Burke*, 2011 UT App 168, ¶ 34, 256 P.3d 1102 (emphasis in original) (citations and internal quotation marks omitted). Unfair prejudice therefore means that the evidence has "an undue tendency to suggest decision on an improper basis." *Id.* (citation and internal quotation marks omitted).

¶24    Logue argues that by undermining defense counsel's credibility, the receipt "would inevitably tie the purchase" of the ammunition to Girlfriend and the jury would be misled "into making connections that were speculative at best." But Logue's claim of unfair prejudice is unavailing. First, the receipt did not really suggest defense counsel was untruthful. In his opening

_____

6. Logue also argues that the receipt created unfair prejudice because he "lacked sufficient time to defend against it." But when the State moved to admit the receipt, the trial court delayed its decision on its admissibility and Girlfriend's testimony to give defense counsel time to investigate the receipt—which counsel proceeded to do with the State's cooperation.

statement, after stating that "there is no forensic evidence" linking Logue to the murder, defense counsel explained:

> There [are] no fingerprints. There's no DNA. There's no gunshot residue. There's no physical evidence whatsoever that . . . Logue was there or had anything to do with this. It's all based on the testimony of . . . witnesses.

Although the receipt is physical evidence, technically speaking, it does not contradict defense counsel's statement to the jury because the receipt does not establish that Logue was at the murder scene. And because the receipt documents a cash sale, it does not even prove that it was Girlfriend who made the purchase. Furthermore, Girlfriend testified that she purchased a box of .38 caliber ammunition, while the receipt showed a cash payment made by someone for one box of *.32* caliber ammunition. Thus, in the context of this case, there could not have been any unfairly prejudicial effect from admission of the receipt.

¶25 Second, defense counsel mitigated any credibility concerns posed by the receipt in his closing argument. Because Girlfriend testified that she had purchased .38 caliber ammunition, defense counsel argued that Girlfriend's testimony did not align with the .32 caliber ammunition documented in the receipt. Defense counsel also pointed out that officers did not recover any .32 caliber ammunition during their search of Girlfriend's trailer home. He further argued that Girlfriend's testimony contradicted the time stamp of "4:23" on the receipt because she said she bought the ammunition "around 6:00 or 6:30." Defense counsel's closing argument effectively demonstrated that the connection between Girlfriend and the receipt was tenuous at best.

¶26 For these reasons, we conclude that the Walmart receipt did not have any unfairly prejudicial effect on defense counsel's

credibility. We therefore conclude that the trial court acted within its discretion in admitting the receipt and in denying Logue's motion for a new trial on the ground that the receipt caused unfair prejudice.

## III. Constitutionality of Logue's Sentence

¶27　Logue challenges the constitutionality of the sentencing scheme in Utah Code sections 76-5-202 and 76-3-207.7. The former section specifies that when a notice of intent to seek the death penalty has been filed by the prosecutor, an aggravated murder charge is a capital felony. Utah Code Ann. § 76-5-202(3)(a) (LexisNexis 2017). If a defendant is found guilty of a capital felony, the jury sentences the defendant, unless the defendant chooses to waive that right. *Id.* § 76-3-207(1)(c)(i). But if the prosecutor chooses not to seek the death penalty, an aggravated murder charge becomes a noncapital first degree felony. *Id.* § 76-5-202(3)(b). And section 76-3-207.7 requires that a defendant convicted of noncapital-first-degree-felony aggravated murder be sentenced by the court, not the jury. *Id.* § 76-3-207.7(1).

¶28　Because a defendant charged with aggravated murder is subject to different sentencing procedures at the prosecutor's discretion, Logue argues that the sentencing scheme violates the federal equal protection and due process clauses, Utah's uniform operation of laws clause, and his right to a trial by jury under the state and federal constitutions. These same challenges were raised in *Met v. State*, 2016 UT 51, 388 P.3d 447, where the Utah Supreme Court held that Utah Code section 76-3-207.7 and the "dual-track sentencing structure for those convicted of aggravated murder do not violate the various federal and state constitutional provisions" raised by Logue. *Id.* ¶ 52. *See also State v. Reyos*, 2017 UT App 132, ¶ 48, 402 P.3d 113 (holding that sections 207 and 207.7, "taken together or independently," do not violate the state constitution's Uniform Operation of Laws Clause and the federal constitution's Equal Protection Clause).

Because the Utah Supreme Court has already answered the constitutionality question, we need not consider it further.

CONCLUSION

¶29   We conclude that there exists sufficient evidence to support Logue's aggravated murder conviction, that the trial court's admission of the Walmart receipt did not cause unfair prejudice, and that the aggravated murder sentencing statutes are constitutional. We accordingly affirm his convictions.

———————