**2020 UT App 129**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JAMES ENOCH HENFLING,
Appellant.

Opinion
No. 20190150-CA
Filed September 11, 2020

Third District Court, Silver Summit Department
The Honorable Patrick Corum
No. 161500049

Ann M. Taliaferro, Attorney for Appellant

Sean D. Reyes and John J. Nielsen, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES KATE APPLEBY and DIANA HAGEN concurred.

MORTENSEN, Judge:

¶1 James Enoch Henfling was convicted of murder, felony murder, and felony discharge of a firearm after firing a single shot from his pistol into the face of his sister's friend during a physical altercation involving the three of them. Henfling appeals his convictions. He argues that the trial court erred by not dismissing his murder charge for insufficient evidence, not dismissing his felony-discharge-of-a-firearm conviction as legally invalid, and denying his motion for a new trial because of erroneous jury instructions and prosecutorial misconduct. We affirm.

BACKGROUND[1]

¶2     Late one evening, Henfling received a call from his sister (Sister) letting him know that she was visiting from out of state and was in Park City, Utah. During the call, Henfling thought Sister sounded both drunk and high on drugs. Worried that she might become a target for sexual assault, Henfling armed himself with a knife, a taser, and a pistol before he, his fiancée (Fiancée), and their three-year-old daughter drove from their residence in Midvale to Park City. They arrived in Park City at about 1:00 AM and Henfling met with Sister and her friend (Victim) at a parking garage.

¶3     Sister was intoxicated and Victim was "really drunk" but was "really happy, [and] nice" and invited everyone back to his condominium. Henfling followed Sister and Victim to the condominium complex and parked "farther off, down the parking lot." The group entered the condominium where Victim briefly introduced one of his roommates (Roommate), who then retired to her bedroom for the night. Victim opened a fold-out couch bed in the living room where he slept and offered to let everyone stay the night. Fiancée sat on the corner of the bed with her sleeping daughter, while Sister, Victim, and Henfling sat in the kitchen. The group talked while Henfling and Victim drank alcohol.

¶4     As the night progressed, Victim and Henfling discussed guns. Victim retrieved his pistol from an ottoman in the living room, and Henfling removed his pistol from the holster on his hip to compare firearms. No threats were made while the guns

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Thompson*, 2017 UT App 183, ¶ 2 n.3, 405 P.3d 892 (cleaned up).

were out; Henfling and Victim were merely "talking shop about guns," and then they put away the guns.

*The Murder*

¶5 Later, Sister called her boyfriend, who was out of state, to let him know she had safely arrived in Utah. During their conversation, Victim took the phone from Sister and threatened her boyfriend, who—according to a social media post made earlier by Sister—had cheated on her. Victim stated that he had been in the military and would kill the boyfriend for his treatment of Sister. Henfling joined in, berating and threatening the boyfriend.

¶6 After the phone call, Sister was angry and wanted to leave. Henfling also wanted Sister to leave and go home with him, fearing that if she stayed, Victim would "take advantage of her" in her inebriated state. Victim, however, did not want Sister to leave and argued with Henfling, yelling and at one point pushing Henfling against the wall by his throat. Fiancée yelled at Victim to stop, and the quarrel ceased.

¶7 Fiancée retrieved the keys to their vehicle and informed Henfling she was going to the truck with their daughter and that "he needed to get ready so that [they] could leave." She left the condominium, followed by Sister, while Henfling remained inside with Victim. Fiancée went to the truck and Sister went to Victim's car to retrieve her belongings. Sister then returned to Victim's condominium. After some time, Henfling came to the truck and took the keys from Fiancée, stating that they weren't leaving yet, and returned to the condominium. Sister came down to sit in the truck with Fiancée and attempted to call Henfling, but her phone would not work. Sister then returned to Victim's condominium to get the keys from Henfling. Henfling and Sister "had words" over him retaining the keys and his intent to drive them home in his intoxicated state.

¶8     During the argument, Henfling became "loud and aggressive" and was rude to Sister. The noise woke Roommate who remained in the bedroom trying to get back to sleep. Sister testified that Victim interjected himself into the argument and Henfling and Victim began to fight and choke each other. Sister attempted to intervene, and Victim punched her in the side of the face. Then she tackled both men to the floor in the living room between the bed and the ottoman. Victim landed slightly reclined against the bed and began to kick or press his bare foot into Henfling's face. Sister, who was between the two, tried to further intervene by pushing them apart and punching Victim in his face. After Sister hit him, Victim looked blankly at her. Henfling removed his pistol from his locking holster,[2] chambered a round, and shot Victim one time in the forehead as Victim remained reclined on the floor. Henfling later stated, "I guess I should have shot him in the foot or the hand or just in the air, but natural reaction, being a hunter . . . you shoot to kill. . . . So, it's what I did."

¶9     Roommate heard the gunshot and hid in her closet, unsure what had happened but thinking that perhaps Victim "took his gun and shot through the roof to try to take [the arguing] people out of the [condominium]." Roommate remained hidden for several minutes until she heard Henfling and Sister leave. After that, Roommate exited the bedroom to see what had transpired. She walked into the hallway and looked to the living room, but she stopped when she saw that Victim was lying on the floor with his feet protruding from behind the pulled-out bed and heard him "snoring"—which unbeknownst to her was actually Victim's agonal breathing as his body gasped for air. From her vantage point, Roommate did not observe

---

2. Henfling explained that his locking holster "[is] not a quick release holster" and that he had to press a release bar before he could unholster the pistol.

Victim's head, and she did not enter the living room to investigate further, thinking that Victim was "too wasted" and had fallen asleep on the floor as he had on previous occasions. Roommate returned to her bedroom to go back to sleep.

*Post-Murder Conduct*

¶10 After leaving the condominium, Henfling and Sister ran to Henfling's truck. Fiancée, who had heard the gunshot and hid herself and her daughter behind a wall, saw Henfling and Sister hurry to the truck and start it. Fiancée jumped in the truck and asked Henfling what happened as he drove away. Henfling responded that he "fucked up" and "just shot someone in the face" and Victim was dead. Learning this, Fiancée told Henfling to stop the truck and let her out. She went to a nearby convenience store with her daughter. Sister also left the truck and attempted to go to another friend's home but she failed to find it and eventually went to the same store as Fiancée.

¶11 When Fiancée entered the store, the store clerk noticed she was distraught and called 911. Officers soon arrived, and Fiancée informed them of the shooting. Sister, however, acted as though she were an uninterested party who was merely in the store to charge her cell phone. Police learned from Fiancée that Sister knew Victim. When police spoke to Sister, she confirmed that she knew Victim and offered to help police find his condominium. But she did not mention that there had been a shooting or that she had witnessed it. An officer accompanied Sister in circles around the area for several minutes without finding the condominium where Victim was shot. Sister eventually called another friend for help, and the officer left Sister at that friend's home. Sister later apologized for lying to the officer about not knowing the location of Victim's condominium.

¶12 In the meantime, Henfling drove around Park City and called his family. First, he called his brother and then his father,

recounting some version of the night's occurrences and claiming that he had a broken jaw and several teeth missing as a result of the fight with Victim. Henfling's father called police dispatch to inform them that Henfling shot someone. The police dispatcher then called Henfling and directed him to the officers waiting at the convenience store where he had left Fiancée. Henfling arrived at the store nearly one hour after shooting Victim.

*Henfling's Accounts*

¶13    The officers at the convenience store detained Henfling. He immediately told the officers that he "didn't mean to shoot" and that "[he] did self-defense" because Victim "was beating [him] with a stick." When asked if he needed medical assistance, Henfling stated that his face hurt but he did not "consider it an emergency." After being read a *Miranda* warning, Henfling agreed to speak to the officers and told them, "I self-defensed myself . . . because he was beating me with a stick. And I shot him in the face. He's dead." Henfling claimed the fight started because Victim was trying to have sex with Sister. He recounted that he and Victim punched each other, and then Victim beat Henfling's face with a stick. Henfling then asserted when he was nearly unconscious, he crawled to his truck, pulled out his pistol, and shot Victim while they were in the parking lot by the truck.

¶14    Police found Victim in his condominium on his back in a pool of blood. He was still alive and breathing but unconscious. However, Victim's wound was not survivable and he died after a few days.

¶15    At the police station later on the morning of the shooting, Henfling claimed he and Victim were wrestling and he had Victim in a chokehold but Victim hit him with "some type of metal pipe or pole." He again asserted that he feared he was losing consciousness and "jolted to his truck," took out the pistol, and shot Victim in the parking lot.

¶16    The next day, Henfling asserted that the group was outside smoking when Victim struck him, first with fists, and then with "a pipe or . . . a stick." He reiterated that he ran to his truck, removed his pistol, and shot Victim in the head while they were outside. But Henfling admitted he was "pretty tanked at the time," meaning that he was very intoxicated, and that he "[didn't] have a clear picture" but "remember[ed] bits and pieces."

¶17    In his fourth police interview, Henfling admitted that he had his pistol in the holster on his hip. He also said he was at the kitchen table when Victim started to punch him. He "remember[ed] getting hit in the face," and the next thing he "remember[ed wa]s just seeing [Victim's] face and [] pulling the trigger." Henfling claimed he spoke to Fiancée from jail the previous evening and that she said the shooting happened inside. But the call was recorded and a transcript revealed that no such dialogue took place.

¶18    Although Henfling complained of injuries to his mouth and throat, the only documented injuries were a swollen lip with a small cut, a minor nosebleed, and light abrasions. He did not have a broken jaw or missing teeth. No injury consistent with the use of a pipe or stick to bludgeon his face was documented. No pipe or stick was found at the scene.

*Sister's Account*

¶19    Sister's first account was provided during a recorded phone conversation at the police station a few hours after the shooting. In that conversation, she told her other brother, "[Victim] pushed me and kicked [Henfling] in the mouth, and then [Henfling] shot him." Minutes later, in an interview with an officer, Sister provided more detail, explaining that as she returned to Victim's condominium to get the keys from Henfling, she and Henfling got into an argument about who would drive because Henfling was intoxicated. Sister claimed

that after the argument, Henfling agreed to give Fiancée the keys. Then Victim punched Henfling, but Henfling did not fight back right away; instead, Sister "stepped in between the two of them, and [Victim] punched [her]." Henfling said, "Are you kidding me? . . . You're going to hit my sister? You're going to fucking punch my sister?" Victim began to choke Henfling, who responded in kind, and Sister attempted to intervene, causing them to all end up on the floor, where she punched Victim in his face to get him off of Henfling, and "next thing [she knew] . . . [Henfling] shot [Victim]." Sister recounted that Henfling exclaimed, "Oh, my God. I can't believe I just did that," and that he "regretted it instantly."

¶20    Sister said that afterward, she and Henfling ran to the truck and explained to Fiancée what happened. Fiancée took her daughter and left the truck, stating she didn't want anything to do with it. Sister said she felt the same way and also left the truck. She wanted to call the police "right away because [she] knew it was wrong," but she was "in such shock and fear . . . [that she] didn't know what to do." Sister stated that no pipe or stick was used to hit Henfling. Sister also said no fight took place outside of Victim's condominium.

*Charging and Court Proceedings*

¶21    Henfling was charged with murder and felony discharge of a firearm with serious bodily injury—this charge was also presented as the predicate offense for a felony murder theory.

¶22    At trial, the defense and prosecution each called experts to shed light on the individuals' positions at the time of the shooting. Blood spatter experts testified about their respective conclusions regarding forward spatter—explained as the spatter that results from blood that travels forward in the same direction as the bullet as it exits the body—and back spatter—explained as the spatter that results from blood directed out of the entrance wound back toward the source of force. The prosecution's expert

classified the blood spatter on the ceiling as back spatter and the blood spatter found on a wall and the floor behind Victim as forward spatter and calculated that Victim's head was one to two feet above the floor when he was shot. The defense's expert agreed on the distance of Victim's head from the floor at the time of the shooting and classified blood found on Sister as back spatter but did not opine on the spatter on the ceiling. Another expert determined the pistol was a mere twelve to twenty-four inches from Victim when he was shot. Additionally, the experts noted that stippling—gunshot residue deposited on and in the skin near an entrance wound when a person is shot at close range—was on Victim's eyelids, indicating that his eyes were closed when he was shot.

¶23  At the close of the prosecution's case, defense counsel moved for a directed verdict on the murder and felony discharge counts, arguing that the State had not disproven self-defense. Defense counsel also moved for a directed verdict on the theory of felony murder, contending that the felony discharge count was not an independent predicate offense. The trial court denied the motions.

¶24  During closing arguments, the prosecutor argued that four variants of the murder statute[3] had been sufficiently demonstrated by the evidence for the jury to convict Henfling of murder. The prosecutor also discussed the blood spatter evidence, drawing an objection from defense counsel, who claimed the evidence was mistakenly mischaracterized. The court found it was for the jury to remember the evidence and decide how to interpret it, and therefore overruled the objection.

---

3. S*ee* Utah Code Ann. § 76-5-203(2)(a)–(d) (LexisNexis 2017). The statutory provisions in effect at the relevant time do not differ from the current provisions in any way material to this case. We therefore cite the current Utah Code for convenience.

The prosecutor made further arguments to which defense counsel did not object.

¶25 During deliberations, the jury sent a question to the judge concerning the law of self-defense and the reasonable person standard.[4] Before the judge and counsel could provide an answer, the jury informed the court it had resolved the issue and reached a verdict. The court nevertheless provided an answer to the jury and instructed it to consider the answer for as long as necessary and then inform the court when it was ready with a verdict.

¶26 The jury found Henfling guilty of murder and of felony discharge of a firearm. Henfling filed a motion to arrest judgment and later a motion for a new trial, asserting many of the same issues he raises on appeal. The trial court denied both motions.

¶27 Henfling appeals.

ISSUES AND STANDARDS OF REVIEW

¶28 Henfling raises several issues on appeal. First, he argues that the trial court erred in refusing to dismiss his murder charge, asserting that "the State failed to present sufficient evidence . . . proving the requisite mens rea beyond a reasonable doubt." Henfling also argues that the State presented insufficient evidence to disprove self-defense to the murder charge beyond a reasonable doubt.[5] "Whether the evidence presented at trial is

---

4. *See* Utah Code Ann. § 76-2-402(2) (LexisNexis Supp. 2019); *id.* § 76-5-203(4) (2017).

5. Henfling asserts that the State presented insufficient evidence to disprove self-defense as to the felony discharge count as well.

(continued…)

sufficient to support the verdict is . . . a question of law, which we review for correctness." *Salt Lake City v. Miles*, 2014 UT 47, ¶ 10, 342 P.3d 212. But "our review is limited to ensuring that there is sufficient competent evidence regarding each element of the charge to enable a jury to find, beyond a reasonable doubt, that the defendant committed the crime." *Id.* (cleaned up). Our inquiry ends "if there is some evidence from which findings of all the requisite elements of the crime can reasonably be made." *Id.* (cleaned up). We also "consider whether a jury could, based on the evidence, make an inference to support a guilty verdict, or whether the guilty verdict rests upon mere speculation." *State v. Logue*, 2018 UT App 156, ¶ 20, 436 P.3d 136 (cleaned up).

¶29  Second, Henfling argues that the trial court "erred in failing to dismiss the felony discharge of a firearm conviction." He asserts that the underlying charge was "invalid as a matter of law." "A trial court's decision to grant or deny a motion to dismiss presents a question of law, which we review for correctness." *State v. Rushton*, 2015 UT App 170, ¶ 4, 354 P.3d 223 (cleaned up).[6]

_____

(…continued)

But beyond making the assertion, Henfling does not explain how it differs from the argument as it relates to the murder charge. We therefore do not address it separately and merely note that the claim fails for the same reasons.

6. Henfling also asserts that the trial court erred in denying his motion to dismiss on the felony murder theory and in instructing the jury on the same, arguing that the predicate offense of felony discharge of a firearm should merge into felony murder. *But see State v. Fedorowicz*, 2002 UT 67, ¶ 60, 52 P.3d 1194 ("[A] conviction for felony murder does not merge with its underlying predicate felony."). The State suggests this point is

(continued…)

¶30    Third, Henfling argues that the trial court erred in denying his motion for a new trial because of several asserted errors in the jury instructions dealing with the charges of felony discharge of a firearm and self-defense. But Henfling did not preserve these arguments at trial and asks us to review them for plain error and ineffective assistance of counsel. Because Henfling asserts claims of plain error and ineffective assistance of counsel as exceptions to preservation, we apply a common standard of review for prejudice.[7] *See State v. Verde*, 770 P.2d 116,

---

(…continued)

moot if we uphold Henfling's sentence for murder under the statutory variant of intentional or knowing murder, for which he was separately found guilty by way of a special verdict form. In his reply, Henfling does not contest the point. We agree that Henfling's argument is moot. Henfling's conviction and sentence for a single count of murder are sustained by the separate variant of intentional or knowing murder, and even if we were to hold that the jury should not have been instructed on the felony murder variant, it would not change the outcome. *See State v. Anderson*, 2007 UT App 304, ¶ 15, 169 P.3d 778 (dismissing cross-appeal as moot because the defendant's convictions were not enhanced as a result of the court's challenged findings); *see also State v. Blubaugh*, 904 P.2d 688, 694 n.3 (Utah Ct. App. 1995) (noting that disposition of defendant's claim that evidence was insufficient to support a verdict of depraved indifference murder rendered moot his challenge to the denial of his motion to dismiss the case).

7. When a defendant raises issues of plain error and ineffective assistance of counsel, a common standard of prejudice applies "because plain error requires a showing that absent the error, there is a substantial likelihood of a more favorable outcome for defendant, and similarly, the ineffective assistance standard requires a showing that but for ineffective assistance of counsel,

(continued…)

124 n.15 (Utah 1989); *see also State v. Litherland*, 2000 UT 76, ¶ 31 n.14, 12 P.3d 92.

¶31 Fourth, Henfling contends that the trial court erred in failing to grant a new trial because of several alleged instances of prosecutorial misconduct. But only one claim raised on appeal was preserved by objection at trial. "Insofar as th[e] issue [i]s preserved, we will review the trial court's rulings on prosecutorial misconduct claims for an abuse of discretion." *State v. Fairbourn*, 2017 UT App 158, ¶ 13, 405 P.3d 789 (cleaned up). The remaining prosecutorial misconduct claims are unpreserved. Henfling asks us to review the unpreserved claims for plain error and ineffective assistance of counsel. *See State v. Hummel*, 2017 UT 19, ¶¶ 102, 105, 111, 393 P.3d 314. Where the trial court has addressed the prosecutorial misconduct claim for ineffectiveness of counsel in a post-trial motion, as in this case, we review the trial court's rulings for correctness. *See State v. Martinez*, 2020 UT App 69, ¶ 25, 464 P.3d 1170.

---

(…continued)
the result would likely have been different for defendant." *State v. Ellifritz*, 835 P.2d 170, 174 (Utah Ct. App. 1992); *see also State v. Garcia*, 2017 UT 53, ¶ 40, 424 P.3d 171 ("[E]rrors in jury instructions—even instructions going to the elements of a charged crime—require harmless-error analysis."). "Because the defendant must show prejudice to prevail under either argument, the common standard merely functions as an analytical shortcut that avoids treatment of the other prongs of the ineffective assistance and plain error standards." *State v. Litherland*, 2000 UT 76, ¶ 31 n.14, 12 P.3d 92; *see also State v. McNeil*, 2016 UT 3, ¶ 29, 365 P.3d 699 ("[T]he prejudice test is the same whether under the claim of ineffective assistance or plain error.").

¶32　Fifth, related to one claim of ineffective assistance of counsel, Henfling seeks a remand under rule 23B of the Utah Rules of Appellate Procedure. Rule 23B permits us to remand a criminal case "to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). This court will grant a rule 23B motion "only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.*

ANALYSIS

I. Sufficiency of the Evidence

A.　Mens Rea

¶33　Henfling first contends that the trial court erred by not dismissing the murder charge against him, asserting that the evidence was insufficient to prove the required mens rea beyond a reasonable doubt. We disagree because his admission that he intended to kill Victim satisfied the mens rea element of murder.

¶34　To support a charge of murder, the State needed to prove one of four statutory variants beyond a reasonable doubt. By way of special verdict, the jury found that the State proved both the fourth variant—felony murder—and at least one of the following:

> (a) the actor intentionally or knowingly cause[d] the death of another;
> (b) intending to cause serious bodily injury to another, the actor commit[ted] an act clearly dangerous to human life that cause[d] the death of another; [or]

(c) acting under circumstances evidencing a depraved indifference to human life, the actor knowingly engage[d] in conduct which create[d] a grave risk of death to another and thereby cause[d] the death of another.

Utah Code Ann. § 76-5-203(2) (LexisNexis 2017). Here, the evidence was sufficient to enable the jury to find, beyond a reasonable doubt, that Henfling intentionally or knowingly caused Victim's death.[8]

¶35 We often look to circumstantial evidence to infer intent, "because intent is a state of mind, which is rarely susceptible of direct proof," *State v. Logue*, 2018 UT App 156, ¶ 17, 436 P.3d 136 (cleaned up), but intent may be proved by direct evidence if it is available, *State v. Minousis*, 228 P. 574, 576 (Utah 1924) ("It is . . . well settled that . . . specific intent may be proved by circumstantial, as well as direct, evidence."). To establish that Henfling intentionally caused Victim's death, the evidence need only show that it was Henfling's "conscious objective or desire to engage in the conduct or cause the result." Utah Code Ann. § 76-2-103(1). Alternatively, to establish that Henfling knowingly caused Victim's death, there must be some evidence showing that he acted "when he [was] . . . aware that his conduct [was] reasonably certain to cause the [death]." *Id.* § 76-2-103(2).

¶36 Here the State provided sufficient competent evidence that Henfling intentionally or knowingly caused Victim's death. Indeed, Henfling admitted as much: "natural reaction, being a hunter . . . you shoot to kill. . . . So it's what I did." This

---

8. Because we determine there is some evidence from which the jury could reasonably find that Henfling intentionally or knowingly caused Victim's death, we need not address the other variants of murder that are satisfied by implication in this case.

admission shows that Henfling intentionally shot Victim with the intent to kill him. Alternatively, it shows that Henfling knew that shooting Victim was reasonably certain to cause his death. This evidence alone is sufficient to enable the jury to find, beyond a reasonable doubt, that Henfling acted with the required mens rea. He does not challenge this admission on appeal but rather asserts that he was justified by self-defense. But the claimed defense is a consideration apart from whether Henfling possessed the required mens rea for murder. Similarly, Henfling's ultimate "objective and desire to stop the [alleged] beating" is a matter for separate consideration as a potential motive for the shooting and does not displace the mens rea.

¶37 Because Henfling's admission shows he intentionally and knowingly caused Victim's death, the trial court correctly found there was sufficient evidence of the required mens rea to support the murder charge.

B. Self-Defense

¶38 Henfling next argues that the "State presented insufficient evidence to disprove [perfect] self-defense or imperfect self-defense beyond a reasonable doubt." We disagree because there was ample evidence from which the jury could conclude that self-defense was disproved beyond a reasonable doubt.

¶39 Utah's self-defense statute provides that "[a]n individual is justified in . . . using force against another individual when and to the extent that the individual reasonably believes that force . . . is necessary to defend the individual . . . against the imminent use of unlawful force." Utah Code Ann. § 76-2-402(2)(a) (LexisNexis Supp. 2019). Furthermore, "[a]n individual is justified in using force intended or likely to cause death or serious bodily injury only if the individual reasonably believes that force is necessary to prevent death or serious bodily injury to the individual . . . as a result of imminent use of unlawful force . . . ." *Id.* § 76-2-402(2)(b). When the statutory criteria are

satisfied, a defendant has a claim for perfect self-defense and is entitled to an acquittal. A defendant may claim imperfect self-defense if "the defendant caused the death of another . . . under a reasonable belief that the circumstances provided a legal justification or excuse for the conduct although the conduct was not legally justifiable or excusable under the existing circumstances." *Id.* § 76-5-203(4)(a) (2017). Imperfect self-defense "operates to reduce a charge of murder to that of manslaughter." *State v. Bonds*, 2019 UT App 156, ¶ 44, 450 P.3d 120, *cert. granted*, 466 P.3d 1072 (Utah 2020). Once evidence of self-defense is produced to support either perfect or imperfect self-defense, the prosecution is required to disprove the affirmative defense beyond a reasonable doubt. *See id.* ¶ 45.

¶40 Here, the State provided sufficient evidence for a jury to determine, beyond a reasonable doubt, that neither self-defense claim applied to the circumstances at issue. Although perfect and imperfect self-defense differ in "the determination of whether the defendant's conduct was, in fact, legally justifiable or excusable under the existing circumstances," *State v. Low*, 2008 UT 58, ¶ 32, 192 P.3d 867 (cleaned up), both defenses require that the defendant hold a reasonable belief that the force used was necessary for defense, Utah Code Ann. § 76-2-402(2)(b) (Supp. 2019); *id.* § 76-5-203(4) (2017); *see Low*, 2008 UT 58, ¶ 32 ("[P]erfect self-defense and imperfect self-defense require the defendant to present the same evidence: that the defendant had a reasonable belief that force was necessary to defend himself."). If the defendant does not have that belief, the defenses cannot apply.

¶41 Here, Henfling asks us to re-weigh the evidence in his favor by identifying evidence that could be construed as favorable to his defense, but he ignores evidence on which the jury could have relied to reach its verdict. *See State v. Frame*, 723 P.2d 401, 404 (Utah 1986) (per curiam) ("[The d]efendant relies only upon his version of the facts, which is not the only

reasonable one. The jury need not accept the version advanced by [the] defendant, but may weigh the evidence and draw its own conclusions and inferences as to his conduct and intent. The existence of contradictory testimony, without more, does not require reversal."). Most notably, Henfling does not grapple with the evidence supporting an inference that he lacked the necessary belief that lethal force was necessary to defend himself.

¶42 For example, a jury might find that Henfling concocted varying accounts of the shooting to provide himself with a claim for self-defense, supporting an inference that the actual scenario that unfolded was one that would not cause Henfling to develop a belief that lethal self-defense was necessary. Additionally, Henfling's relatively minor injuries—a swollen and cut lip, light abrasions, and a minor bloody nose—supported an inference that Henfling did not believe that lethal self-defense was necessary, especially in light of evidence that Henfling and Victim fought that same night without escalating to use of their guns, and Henfling's admission that "[he] should have shot [Victim] in the foot or hand or just in the air" but instead "[shot] to kill." Furthermore, the jury could have inferred that Henfling killed Victim out of malice. Henfling was upset that Victim hit Sister moments before shooting Victim. He exclaimed, "Are you kidding me? . . . You're going to hit my sister? You're going to fucking punch my sister?" Moments later, he declared he had "fucked up," arguably recognizing that his actions were unnecessary and disproportionate to any threat he faced.

¶43 Lastly, though Henfling interprets it otherwise, the jury could have viewed the forensic evidence as disproving that Henfling believed lethal self-defense was necessary. When Henfling shot Victim, Victim's head was only one to two feet above the floor, his eyes were closed, and the pistol was a mere twelve to twenty-four inches from his head. And the State's expert testified the blood spatter on the ceiling was from the

entrance wound, suggesting that Henfling was likely over Victim, rather than lying on the floor next to him. From any of this evidence, a jury could have inferred, as the State argued, that Henfling "executed" Victim when Victim posed no imminent threat rather than acting under a belief that lethal self-defense was necessary to prevent serious bodily injury or death. *See State v. Garcia-Mejia*, 2017 UT App 129, ¶ 19, 402 P.3d 82 ("The State presented evidence. Defendant presented conflicting evidence. That the jury resolved the conflict against [d]efendant does not mean that the evidence was legally insufficient to support [d]efendant's conviction; it means that the jury engaged in its appointed role as factfinder.").

¶44 Because a jury could, based on the evidence, make inferences to support a finding that the State disproved self-defense beyond a reasonable doubt, the trial court correctly found there was sufficient evidence to support the murder charge.

## II. Validity of Felony Discharge of a Firearm

¶45 Henfling argues that the trial court "erred in failing to dismiss the felony discharge of a firearm conviction," asserting that the charge "is invalid as a matter of law." The crux of Henfling's argument is that the charge was inapplicable because the statute is not one "which punishes firearm discharges that result in death," and Henfling's action resulted in the death of Victim rather than resulting in lesser injury. Henfling proffers, as a matter of statutory construction, that because a general statute must give way to a more specific statute, felony discharge of a firearm must give way to the charge of murder when death results. Although it "is the rule that a statute dealing specifically with a particular issue prevails over a more general statute that arguably also deals with the same issue," *Lyon v. Burton*, 2000 UT 19, ¶ 17, 5 P.3d 616, (as amended), that rule is inapposite here. The felony discharge of a firearm statute operates in concert with

the murder statute to make the act a separately chargeable predicate offense that contemplates death as a resultant injury.

¶46     We "interpret [a] statute according to its plain language" because it is the "best evidence" of the legislature's "true intent and purpose," and evincing the legislature's intent is "our primary goal." *State v. McKinnon*, 2002 UT App 214, ¶ 6, 51 P.3d 729 (cleaned up). "The plain language of a statute is to be read as a whole, and its provisions interpreted in harmony with other provisions in the same statute and with other statutes under the same and related chapters." *Lyon*, 2000 UT 19, ¶ 17 (cleaned up).

¶47     The statute for felony discharge of a firearm states a person is guilty of the offense if "the actor discharges a firearm in the direction of one or more individuals, knowing or having reason to believe that any individual may be endangered by the discharge of the firearm." Utah Code Ann. § 76-10-508.1(1)(a) (LexisNexis Supp. 2019). It further dictates that the offense is a third degree felony, unless it causes bodily injury, which is a second degree felony, or serious bodily injury, which is a first degree felony. *Id.* § 76-10-508.1(1)–(3).

¶48     By the plain language of the statute, the offense is committed when the firearm is discharged. The degree of any resulting injury serves as a sentencing enhancement. The offense is accomplished whether or not bodily injury results. Thus, Henfling committed the offense the moment he discharged the firearm under the requisite circumstances, regardless of whether Victim sustained no injury, bodily injury, or serious bodily injury. Therefore, the charge applies to Henfling's action.

¶49     Additionally, the statute's reference to serious bodily injury clearly contemplates death as an outcome of the criminal act. *See id.* § 76-1-601(17) (Supp. 2020) ("'Serious bodily injury' . . . *creates a substantial risk of death.*" (emphasis added)). And nothing in the plain language of the statute limits the offense to injuries that are serious but do not cause death, describing a

threshold rather than an outer limit. Therefore, the statute's plain language does not prevent Henfling from being charged with the offense simply because Victim ultimately died from the serious bodily injury inflicted when Henfling shot him in the face.

¶50 Furthermore, the murder statute does not operate to the exclusion of the felony discharge of a firearm statute when death results. Rather, the murder statute expressly contemplates felony discharge of a firearm as a predicate but "separate offense [that] does not merge with the crime of murder." *Id.* § 76-5-203(5)(a) (2017); *id.* § 76-5-203(1)(v); *see State v. Martinez*, 2019 UT App 166, ¶¶ 20–22, 452 P.3d 496 (holding the legislature expressly exempted the enumerated predicate offense of felony discharge of a firearm from operation of the merger doctrine in the murder statute), *cert. granted*, 462 P.3d 798 (Utah 2020).[9] And in addition to murder, a defendant "may also be convicted of, and punished for, the separate offense" of felony discharge of a firearm. Utah Code Ann. § 76-5-203(5)(b).

¶51 Accordingly, the plain language of the statutes provides that murder does not displace felony discharge of a firearm when death results. This is not a scenario in which a more general statute gives way to one of greater specificity. Rather, the

---

9. Henfling also asserts that the conviction for felony discharge of a firearm should have merged with that of felony murder to deprive the felony murder variant of a requisite predicate offense. In addition to conflicting with our decision in *State v. Martinez*, 2019 UT App 166, ¶¶ 20–22, 452 P.3d 496 (holding the predicate offense of felony discharge of a firearm is exempted from the merger doctrine in the murder statute) *cert. granted*, 462 P.3d 798 (Utah 2020), which issued after Henfling filed his initial brief, this argument is moot for the same reasons we articulate above, *supra* note 6, and we therefore do not address it.

statutes, read in harmony, operate together, and both offenses may be charged where appropriate.

¶52 Because the murder statute does not provide greater specificity regarding the conduct at issue here, it does not prevail over the felony discharge of a firearm statute to make the charge invalid as a matter of law.

### III. Jury Instructions

A. Felony Discharge of a Firearm

¶53 Henfling argues that the trial court erred in denying his motion for a new trial because the jury was not instructed as to all the elements of felony discharge of a firearm. We agree that the instruction was in error but conclude the error was harmless.

¶54 Henfling asserts, and the State concedes, that the jury instruction for felony discharge of a firearm as a first degree felony was incomplete because it did not require the jury to find serious bodily injury, an element of the convicted offense. *See* Utah Code Ann. § 76-10-508.1(3) (LexisNexis Supp. 2019). Henfling contends that this omission prejudiced him because the jury did not have to find this element beyond a reasonable doubt to convict him.

¶55 In determining "whether the omission of an element from a jury instruction is harmless error[, we ask] whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *State v. Ochoa*, 2014 UT App 296, ¶ 5, 341 P.3d 942 (cleaned up). If there is no such evidence, and "the facts indisputably establish [the omitted] element and that element is not an issue at trial, a trial court's failure to instruct on the element cannot be prejudicial." *State v. Clark*, 2014 UT App 56, ¶ 57, 322 P.3d 761; *see also Ochoa*, 2014 UT App 296, ¶ 5.

¶56 Normally our confidence in a verdict might be undermined if a jury did not consider whether each element of a criminal offense was proved beyond a reasonable doubt. *See Clark*, 2014 UT App 56, ¶ 57 ("Generally, the trial court's failure to instruct the jury on the basic elements of an offense cannot be considered harmless error."). But no evidence was presented to show that Victim's injury was anything other than serious bodily injury. Rather, the element was undisputed—indeed Henfling admitted he shot Victim and that "[Victim's] wound was not survivable and he died a few days later." The gunshot wound to Victim's face was serious bodily injury because it was the type of injury that created a substantial risk of death, and in this case admittedly led to Victim's death. *See* Utah Code Ann. § 76-1-601(17) (Supp. 2020) (serious bodily injury is "bodily injury that creates . . . a substantial risk of death."). Henfling did not contest this fact at trial and offered no evidence to support a contrary finding. Indeed, all the evidence, including Henfling's own admissions, indisputably established that Victim sustained serious bodily injury.

¶57 As a result, our confidence in the verdict remains because Henfling has not shown, and indeed does not suggest in his briefing, how the inclusion of the undisputed, but omitted, element in the jury instruction would have likely resulted in a different outcome. Because Henfling was in no way prejudiced by the exclusion of the serious-bodily-injury element of the offense, the error was harmless and his claim fails. *See Clark*, 2014 UT App 56, ¶ 58 (stating that where a defendant has not shown prejudice related to an arguably incomplete jury instruction, he has not demonstrated either plain error or ineffective assistance of counsel).

B.    Self-Defense

¶58 Henfling further argues that the trial court erroneously denied his motion for a new trial, asserting four mistakes in the

jury instructions on self-defense. Henfling does not meet his burden to establish prejudice for any of these unpreserved claims.

¶59 To succeed on his unpreserved claims under the common standard of review applicable to both plain error and ineffectiveness of counsel, Henfling must show prejudice. *See State v. Apodaca*, 2018 UT App 131, ¶ 84 n.14, 428 P.3d 99. Even if "certain of the instructions could have been slightly more accurate or more complete [it] does not mean they were inaccurate, incomplete, . . . erroneous . . . [or] prejudicial." *State v. Nelson*, 2015 UT 62, ¶ 47, 355 P.3d 1031. As we review the jury instructions, we bear in mind "that jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might"; rather they "thrash them out during their deliberations, using their commonsense understanding of the instructions in the light of all that has taken place at the trial." *Id.* ¶ 42 (cleaned up). If, "taken as a whole, the jury was fairly instructed," we will not reverse. *Id.* ¶ 47. Nevertheless, we "have stated that self-defense instructions must clearly communicate to the jury what the burden of proof is *and* who carries the burden." *State v. Bonds*, 2019 UT App 156, ¶ 49 n.6, 450 P.3d 120 (cleaned up), *cert. granted*, 466 P.3d 1072 (Utah 2020).

¶60 First, Henfling asserts that "the jury was erroneously instructed on the law . . . of self-defense" because Instruction No. 38 "failed to accurately instruct as to the 'reasonable person' standard" by including a qualification that a "reasonable individual [is] in full possession of their faculties." Instruction No. 38 stated:

> You are instructed that "reasonably believes" is a standard that [a] reasonable individual in full possession of their faculties would entertain under similar circumstances. In determining imminence

or reasonableness, you may consider, but are not limited to, any of the following factors:
the nature of the danger;
the immediacy of the danger;
the probability that the unlawful force would result in death or serious bodily injury;
the other's prior violent acts or violent propensities; and
any patterns of abuse or violence in the parties' relationship.

"Reasonable belief" shall be determined from the viewpoint of a reasonable person under the then existing circumstances.

¶61 During deliberations, the jury sent a written inquiry to the judge regarding Instruction No. 38, asking,

[C]an you clarify just for confirmation that sentences 1 through 3 and the last one on Instruction 38 that we are not to take alcohol or drugs into consideration, that we just judge what his actions would be based on what a reasonable person would do, that drugs and alcohol cannot be any type of defense or influence on his mental capacity and state of reasonableness of his actions? . . . [S]hould [we] ignore alcohol use and deliberate based on them being a reasonable noninfluenced person[?]

However, before the judge and counsel provided an answer, the jury withdrew the question, indicating it had resolved the matter and reached a verdict. Nevertheless, the court answered the question and provided the jury with this additional guidance:

First, please look closely at Instructions 37 and 38. To determine if the Defendant reasonably believed

that shooting his gun was necessary to prevent death or serious bodily injury to himself or another person, you should compare his belief with what a reasonable person, in full possession of his faculties, would have believed under the same circumstances.

The jury was further instructed, "Consider this [answer] as long as you need to. After you consider it, let us know when you are ready with your verdict." The jury thereafter returned the guilty verdict on all counts.

¶62   Henfling offers conclusory assertions that Instruction No. 38 was "legally incorrect" but fails to cite any authority for this claim. Furthermore, Henfling does not support his argument of associated prejudice. He merely states that the jury's understanding of the self-defense claim was "clearly tainted by the confusing instruction" but fails to recognize that the court provided additional clarifying instructions to the jury. These deficiencies fall short of the Utah Rules of Appellate Procedure's directive that an appellant provide "reasoned analysis supported by citations to legal authority and the record, [as to] why the party should prevail on appeal." Utah R. App. P. 24(a)(8); *see Nelson*, 2015 UT 62, ¶ 49 (holding appellant failed to show prejudice in compliance with rule 24 because he merely pointed to potential conflicts in the instructions, alleged error without showing it, failed to develop arguments, and offered conclusory statements). Accordingly, Henfling has failed to demonstrate prejudice here.

¶63   Second, Henfling asserts that the jury was erroneously instructed on the law of self-defense because the instructions "failed to accurately instruct as to imperfect self-defense" by indicating it was a "partial defense," did not define "reasonable belief," and did not instruct the jury on how to proceed following a finding of imperfect self-defense.

¶64 Henfling asserts imperfect self-defense was erroneously referred to as a "partial defense" rather than "a true affirmative defense" but fails to articulate the significance of that wording, making it a distinction without a difference. Furthermore, "imperfect self-defense is only a partial defense that . . . results only in reduction of a conviction from murder to manslaughter, whereas perfect self-defense is a complete defense to any crime." *Bonds*, 2019 UT App 156, ¶ 44 (cleaned up). There was no error, let alone prejudice, in referring to imperfect self-defense as a partial defense.

¶65 Henfling's assertions that the instruction also was in error because "reasonable belief" was not defined and because it did not "direct the jury what to do" upon finding self-defense applied, are unavailing because the instructions provided that information elsewhere. *See Nelson*, 2015 UT 62, ¶ 44 (stating we consider jury instructions as a whole). Specifically, regarding imperfect self-defense, Instruction No. 42 provided that the "effect of the defense is to reduce the crime of murder to manslaughter," and also stated that if the State did not disprove the defense, "the defendant may only be convicted of manslaughter." (Cleaned up.) Additionally, Instruction No. 38 defined "reasonable belief" and the concept was addressed again in the remedial instruction provided to the jury during deliberations. Accordingly, Henfling does not show error or prejudice associated with this claim.

¶66 Third, Henfling asserts that the jury was erroneously instructed because the instructions were over-inclusive and contained inapplicable exceptions to his self-defense claim. In particular, Henfling argues that the jury may have been misled into thinking he had a duty to retreat because the instruction stated, in part, "A person does not have a duty to retreat from the force or threatened force in a place where that person has lawfully entered or remained . . . ." But the language of the instruction was merely superfluous, not misleading, and the

prosecutor did not argue that Henfling had a duty to retreat. *See State v. Ojeda*, 2015 UT App 124, ¶ 6 n.1, 350 P.3d 640 ("Inclusion of the inapplicable language from the statute did not prejudice [d]efendant, as the jury heard no evidence consistent with [the superfluous variant] but ample evidence bearing on the other statutory variants."); *accord State v. Reid*, 2018 UT App 146, ¶ 35, 427 P.3d 1261. Therefore, there was no risk that the jury would be misled by the instruction to find an "absolutely inapplicable" duty to retreat preempted Henfling's claims of self-defense, and no prejudice could result. *See State v. DeAlo*, 748 P.2d 194, 198 (Utah Ct. App. 1987) (ruling the erroneous inclusion of a "superfluous" jury instruction was "harmless").

¶67 Fourth, Henfling asserts that the jury instructions lacked clarity "as to the State's Burden to disprove affirmative defenses beyond a reasonable doubt." Although "instructions on affirmative defenses must clearly communicate to the jury what the burden of proof is and who carries the burden" because it "is counterintuitive," *Bonds*, 2019 UT App 156, ¶ 45 (cleaned up), an instruction need not communicate that burden in a particular manner, *see State v. Clayton*, 646 P.2d 723, 725 (Utah 1982) ("Even these instructions [regarding the prosecutor's burden of proof] need not be given with any particular words or phrases . . . [but must] use language which the jury would understand." (cleaned up)).

¶68 Here, the instructions communicated the State's burden by informing the jury that one element of murder the State had to "prove[] beyond a reasonable doubt" was that "the defendant did not act with either self-defense or imperfect self-defense." The instructions further emphasized that "the State must prove beyond a reasonable doubt that [self-]defense does not apply" and that "it is the prosecution's burden to prove beyond a reasonable doubt that the defendant did not act in self-defense." The instructions clearly and correctly directed the jury to apply the burden to the State; no instruction improperly shifted the

burden as Henfling implies. Henfling was not prejudiced by the absence of the particular phrasing for which he advocates.

¶69   Because Henfling does not show prejudice stemming from any of the asserted errors in the self-defense jury instructions, his claims for plain error and ineffective assistance of counsel fail.

## IV. Alleged Prosecutorial Misconduct

¶70   Henfling contends that the trial court erred in failing to grant a new trial because of instances of prosecutorial misconduct. We disagree.

¶71   "Prosecutorial misconduct is not a standalone basis for independent judicial review," *State v. Reid*, 2018 UT App 146, ¶ 40, 427 P.3d 1261 (cleaned up), and we do not review "whether to question the prosecutor's actions," *see State v. Hummel*, 2017 UT 19, ¶¶ 111, 117, 393 P.3d 314; *accord Reid*, 2018 UT App 146, ¶ 40. Rather, we "review the decisions of lower courts," *Hummel*, 2017 UT 19, ¶ 107, and when an appellant alleges prosecutorial misconduct, we review the trial court's ruling regarding the challenged conduct, *see Reid*, 2018 UT App 146, ¶ 40. However, "the law of preservation controls" and we review unpreserved prosecutorial misconduct issues "under established exceptions to the law of preservation," if asserted by an appellant. *See id.* (cleaned up); *see also Hummel*, 2017 UT 19, ¶¶ 105–110 (holding "plain error review [for prosecutorial misconduct] considers the plainness or obviousness of the district court's error").[10]

---

10.   Assuming that prosecutorial misconduct can be demonstrated, Henfling posits that the State must show the misconduct was harmless beyond a reasonable doubt, citing *State v. Ross*, 2007 UT 89, 174 P.3d 628. The State disagrees, arguing that the burden is on the appellant for most preserved

(continued…)

A. Statements on Forensic Evidence

¶72 Henfling first asserts the court abused its discretion by allowing the prosecutor to make "misstatements of the forensic evidence to argue a surprise execution theory in final rebuttal."

¶73 Although "a prosecutor may not assert arguments he knows to be inaccurate," *State v. Larrabee*, 2013 UT 70, ¶ 24, 321 P.3d 1136 (cleaned up), "courts grant considerable freedom during closing arguments for counsel to discuss fully from their standpoints the evidence and the inferences and deductions arising therefrom," *State v. Thompson*, 2014 UT App 14, ¶ 51, 318 P.3d 1221 (cleaned up). To demonstrate error sufficient to

---

(…continued)

claims and is always on the defendant for unpreserved claims. But because Henfling does not establish that prosecutorial misconduct occurred for his preserved claim, we need not address which party bears what burden of proof as it concerns any resultant harm for preserved claims. *See State v. Leech*, 2020 UT App 116, ¶ 43 n.7 ("Except in cases of constitutional error, Utah law places the burden on the defendant to prove that a preserved error is harmful.").

But Henfling's reliance on *Ross* for his unpreserved claims of prosecutorial misconduct ignores both *State v. Bond*, 2015 UT 88, 361 P.3d 104, requiring a defendant to demonstrate prejudice on an unpreserved constitutional claim, *id.* ¶ 46, and *State v. Hummel*, 2017 UT 19, 393 P.3d 314, applying and extending *Bond* in plain error review of unpreserved prosecutorial misconduct claims, *id.* ¶ 107. *See also United States v. Olano*, 507 U.S. 725, 734 (1993) (explaining that under plain error, "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice"). Under *Bond* and *Hummel*, a defendant bears the burden to prove the harm of a plain error for unpreserved prosecutorial misconduct claims.

warrant a reversal for prosecutorial misconduct, "a defendant must establish both that the prosecutor's conduct called to the attention of the jurors matters they would not be justified in considering in determining their verdict and, under the circumstances of the particular case, the error is substantial and prejudicial." *State v. Ashcraft*, 2015 UT 5, ¶ 31, 349 P.3d 664 (cleaned up).

¶74 During closing rebuttal, the prosecutor commented on the blood spatter evidence, reminding the jury that the experts testified that the back spatter, or spatter which disperses back toward the source of force out of the entrance wound, was found on the ceiling and the forward spatter, or the spatter that follows the projectile forward along its trajectory out of the exit wound, was found on the floor and wall behind Victim. The prosecution reviewed this evidence and characterized the event as an execution. Defense counsel objected to the prosecutor's characterization of the blood spatter evidence and argued that it was the forward spatter that was found on the ceiling. The trial court ruled that the competing interpretations of the expert testimony was a matter for the jury to consider and overruled the objection. When Henfling raised the issue anew in his motion for a new trial, the court concluded that there was no misconduct because there was no duty to disclose the prosecutor's theory and the standard was whether the evidence supported the theory asserted, which it did.

¶75 Henfling maintains on appeal that the evidence was mischaracterized and the prosecutor misrepresented this evidence by stating "everyone who testified agreed" about the blood spatter evidence. He is mistaken. The State's witnesses specifically testified that the blood spatter on the ceiling was from the entrance wound and blood spatter from the exit wound was found on the floor and wall behind Victim. No expert refuted this evidence. Therefore, the prosecutor did not inaccurately characterize the evidence, nor did she present

evidence that was not already in the record. She interpreted the evidence to conclude all experts were in agreement as to which blood stains were forward spatter and which were back spatter, even if there was some small variation in how each expert described the composition of the blood stains. The prosecutor's comments on the blood stains reflected a permissible deduction from evidence in the record. She expressly referred jurors to their own memory of the experts' testimonies relating to the blood spatter evidence, stating, "this is your memory . . . you are going to have to remember [the testimony]. But we would submit and the evidence shows that everyone . . . who testified, testified that blood [on the ceiling] . . . was not forward spatter." The prosecutor also "explained the basis of [her] deduction" by referencing the forward spatter from the exit wound in the corner of the room and the back spatter from the entrance wound on the ceiling, suggesting that Henfling deliberately shot, or executed, Victim.[11] *See Thompson*, 2014 UT App 14, ¶ 55. Furthermore, "the prosecutor was responding" to Henfling's theory and argument that he shot Victim in self-defense. *See id.* Accordingly, when considered in context, the prosecutor's arguments did not call to the attention of the jurors matters they would not be justified in considering.

¶76    Because there was no prosecutorial misconduct in these challenged statements, the court did not abuse its discretion in overruling Henfling's contemporaneous objection or in denying his later motion for a new trial.

---

11. Henfling also asserts that the prosecutor's execution argument was "a complete and unfair surprise." However, Henfling concedes the State's experts testified "that stains on the ceiling would be consistent with back spatter," and the State's theory of prosecution for the murder charge was that Henfling deliberately killed Victim. We do not view the prosecutor's statement as a change of theory.

B.        The Prosecutor's Other Statements[12]

¶77    Henfling also argues that prosecutorial misconduct occurred when the prosecutor "repeatedly expressed personal opinions, commented on the credibility of the defendant or others, and . . . commented on facts not in the record" during closing argument. He argues that his attorney rendered ineffective assistance by failing to object and that, even in the absence of an objection, the trial court plainly erred in failing to address these instances of alleged misconduct. We discern no misconduct in most of the challenged statements, and no prejudicial misconduct in the remaining statement, and we therefore conclude that there was no objectively unreasonable performance to support Henfling's ineffective assistance of counsel claim and no plain error.

---

12. The State asserts the remaining claims are unpreserved, pointing out that Henfling failed to object at trial to the remaining instances of alleged misconduct. Henfling admits that no objection was made at trial, but asserts that his post-trial motion was adequate to preserve the claims. We have "consistently held that a defendant who fails to preserve an objection at trial will not be able to raise that objection on appeal unless he is able to demonstrate either plain error or exceptional circumstances." *State v. Larrabee*, 2013 UT 70, ¶ 15, 321 P.3d 1136 (cleaned up). And more particularly, "with respect to appellate review of closing arguments, [the Utah Supreme Court has] previously held that [courts] will not examine the State's closing argument if the defendant failed to timely object to it." *Id.* (cleaned up); *see also State v. Hatch*, 2019 UT App 203, ¶ 25 n.8, 455 P.3d 1103 ("Our Supreme Court has held that an objection that could have been raised at trial cannot be preserved for appeal in a post-trial motion." (cleaned up)). The trial court's review of Henfling's post-trial motions also correctly reviewed his claims as unpreserved and treated them accordingly.

¶78 "[I]t is important that both the defendant and the prosecutor have the opportunity to meet fairly the evidence and arguments of one another." *United States v. Robinson*, 485 U.S. 25, 33 (1988). Consequently, prosecutors "have the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports and have the duty and right to argue the case based on the total picture shown by the evidence." *State v. Roberts*, 2019 UT App 9, ¶ 14, 438 P.3d 885 (cleaned up). Additionally, "counsel for each side has considerable latitude in closing arguments and may discuss fully his or her viewpoint of the evidence and the deductions arising therefrom." *State v. Bakalov*, 1999 UT 45, ¶ 56, 979 P.2d 799 (cleaned up). In addition to discussing evidentiary deductions, a "prosecutor may . . . make assertions about what the jury may reasonably conclude from those deductions." *Id.* ¶ 57. In reviewing a prosecutor's comments, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974). But a prosecutor's personal opinions may not be offered either to "sway the jury to consider factors other than evidence presented at trial" or if the jury would consider the personal opinion "to be factual testimony from the prosecutor." *Bakalov*, 1999 UT 45, ¶¶ 57–58 (cleaned up); *see Thompson*, 2014 UT App 14, ¶ 51 ("Counsel may not assert personal knowledge of the facts in issue or express a personal opinion, being a form of unsworn, unchecked testimony which tends to exploit the influence of the prosecutor's office." (cleaned up)). "In particular, a prosecutor must avoid vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused." *Thompson*, 2014 UT App 14, ¶ 51 (cleaned up). "A prosecutor's statements about the veracity of a witness's testimony are permissible only if it is a conclusion that the jury could have reasonably inferred from the evidence." *Id.* ¶ 52 (cleaned up). If a prosecutor's "statement that the defendant lied is a fair inference that is supported by the evidence, it is not improper." *State v. Almaguer*, 2020 UT App 117, ¶ 17 (cleaned

up); *see id.* ("There is nothing inherently improper about a prosecutor calling the defendant a liar. Indeed, a prosecutor's statement that a witness is lying is analyzed under the same test as any other comment on the credibility of a witness." (cleaned up)).

1.     The Prosecutor's Comments on the Closed Curtains

¶79     Henfling argues that the prosecutor impermissibly expressed a personal opinion when she stated that "somebody closed those curtains" after Victim was shot and opined, "I submit it's probably the [inaudible] defendant . . . to hide what was going on inside." This was not an impermissible personal opinion but rather a deduction based on the evidence. In her remarks before the comment at issue, the prosecutor discussed the expert testimony about blood spatter and the direction of travel, reminding the jury that the blood spatter was on the glass, not on the curtains, even though the curtains were closed when the first responding officer arrived at the scene. Because Victim was immobilized by his injury and the only other occupant of the condominium at the time of the shooting denied entering the living room, the prosecutor could infer that Henfling closed the curtains. And the prosecutor's suggestion of Henfling's motive to do so was not inconsistent with other evidence, including testimony from Roommate that Henfling and Sister remained in the condominium for several minutes after the shooting, Henfling's varying testimony, and his hour-long delay in approaching the police with a claim of self-defense. Because there was no improper personal opinion in the prosecutor's statement, defense counsel did not render ineffective assistance in foregoing an objection, and the trial court had no duty to intervene absent an objection.

2.     Comments on Witness Credibility

¶80     Henfling next complains that the prosecutor was allowed to make pervasive statements of "improper personal opinions

and comments on the credibility of witnesses," citing four separate statements. Henfling first points us to the prosecutor's statements that Henfling had a "made up story of self-defense" and had exaggerated his injuries to bolster that claim. Like the preceding comments, these statements by the prosecutor followed her discussion of relevant evidence. The prosecutor highlighted for the jury that neither Henfling nor Sister called the police after the shooting, nor did either seek medical assistance for Victim. Rather, Sister called her boyfriend and went to the convenience store acting like an uninvolved party merely seeking to charge her phone. Henfling called his brother and then his father. And it was Henfling's father who ultimately called the police to report the shooting. The prosecutor pointed out that Henfling's father testified that Henfling had exaggerated the extent of his injuries to try to get help. The prosecutor further pointed out that the evidence showed Henfling had only a bloody nose and there was no physically detected trauma to support Henfling's claim he was injured from being beaten with a rod or choked, nor were there signs of a serious struggle or fight between Henfling and Victim in the room where Henfling shot Victim. All this was in addition to Henfling's multiple changing accounts of the night's occurrences. Accordingly, the challenged statements were not an improper personal opinion or improper comment on witness credibility but rather an assertion about what the jury could reasonably conclude from the evidence and its supportable deductions.

¶81 Second, Henfling suggests that it was improper for the prosecutor to quote Henfling's peculiar statement to the police that he "did self-defense." But the prosecutor merely was calling evidence in the record to the jury's attention. *See State v. Bryant*, 965 P.2d 539, 550 (Utah Ct. App. 1998) ("The prosecutor's comments, though colloquial, vigorous, and colorful, fell within the wide latitude permitted counsel in presenting closing arguments to the jury."). The prosecutor's direct quotation of

Henfling's own comments is not an improper personal opinion, improper comment on witness credibility, or reference to evidence not in the record.

¶82    Third, Henfling directs us to the prosecutor's comments telling the jury, "You can't believe anything he says. . . . The evidence shows that nothing he said can be believed." In making this argument, the prosecutor highlighted the inconsistencies in Henfling's multiple accounts of the shooting and the incompatibility of Henfling's statements and testimony with the physical evidence. As such, her argument was not a statement of personal belief but was an assertion about what the jury should infer from the evidence during deliberations. *See Thompson*, 2014 UT App 14, ¶ 51; *Almaguer*, 2020 UT App 117, ¶ 17.

¶83    Fourth, Henfling raises the prosecutor's statements about Sister, that "she can't be believed either," that "we know her account is not completely honest," and that a portion of her testimony "is just nonsense" and "didn't happen." Similar to the prosecutor's comments on Henfling's testimony, the comments on Sister's testimony highlighted inconsistencies among the multiple accounts provided of the shooting and the physical evidence. Furthermore, the arguments that a portion of Sister's testimony "is just nonsense" and "didn't happen" were made as the prosecutor pointed out direct conflicts between Sister's testimony and the physical evidence on record concerning Victim's position in the room and thus were not based on personal opinion but were grounded in the prosecutor's interpretation of the evidence in the record. As such, the arguments were not impermissible comments on witness credibility.[13] *See Thompson*, 2014 UT App 14, ¶ 51.

---

13. Henfling similarly asserts the prosecutor offered improper personal opinions regarding the father's testimony, but does

(continued…)

¶84 Therefore, Henfling cannot establish either plain error on the part of the trial court or ineffective assistance of counsel based on his attorney's failure to object.

3.      Comments on Self-Defense

¶85 Henfling next contends that "the Prosecutor repeatedly misstated the law of self-defense." He first cites the prosecutor's comments that Henfling was "closest to the door" and that "he could have left." To begin, we observe that the prosecutor was not speaking about self-defense regarding the comment about Henfling's ability to leave but was discussing the depraved-indifference variant of murder and whether Henfling could have avoided the risks he undertook in shooting Victim in the head.

¶86 Next, the prosecutor's comment that Henfling was "closest to the door" at the time of the shooting was in reference to disproving self-defense, but not made in the context Henfling suggests. Henfling asserts the comment was error because "there is no duty to retreat from an assault." (Citing *In re M.S.*, 584 P.2d 914, 916 (Utah 1978).) But the prosecutor's statement was among a series of comments meant to rebut Henfling's claim that Victim posed a threat of force that "would result in death or serious harm." The prosecutor never argued Henfling had a duty to retreat. She said, "All [Victim] had to defend himself were his . . . hands and his feet. There was no weapon. [Victim] had no weapon. I'll say it again, Henfling was closest to the door. No probability that any force [Victim] was using would result in death or serious harm." It was proper for the prosecutor to offer

_____

(…continued)

nothing more than make the assertion. Accordingly, Henfling has inadequately briefed the issue and thus failed to carry his burden of persuasion as it relates to the comments regarding the father's testimony. *See* Utah R. App. P. 24(a)(8).

arguments regarding the level of any threat Victim may have posed. And it was permissible for the prosecutor to suggest that Victim may have posed a lesser threat, given Henfling's position closest to the door, than he would have if Henfling had been trapped in the corner of the room or if Victim had been in possession of a weapon. Accordingly, the prosecutor's comments were not improper.

¶87 Henfling next takes issue with the prosecutor's argument that Victim "did not pose an immediate threat of death to [Henfling]." Henfling argues the statement was a misrepresentation of the law because to justify deadly force in self-defense, a party may show that force was "necessary to prevent death *or* serious bodily injury . . . , *or* to prevent the commission of a forcible felony." (Referencing Utah Code Ann. § 76-2-402(2) (Supp. 2019)). We cannot agree with Henfling's suggestion that any reference to statute be a verbatim recitation of the text. Attorneys often use parlance to keep their comments succinct and to avoid detracting from the point they are making, especially during closing argument, a practice permitted under the considerable latitude afforded to counsel during closing argument. *See Bakalov*, 1999 UT 45, ¶ 56. That is what the prosecutor did in the instances cited by Henfling. There are ample other instances in the record of the prosecutor making reference to the full statutory criteria at issue in the case during closing argument. Additionally, the jury had the instruction on self-defense that adequately informed it of the relevant criteria.[14]

---

14. Henfling also challenges the prosecutor's comment about his injury or lack thereof, asserting it was improper because no injury is required to prove self-defense. But Henfling fails to identify a place in the record where such an argument was made. Accordingly, he has failed to carry his burden on appeal. *See* Utah R. App. P. 24(a)(8). Additionally, even though it is true that no injury is required to prove self-defense, *see* Utah Code

(continued…)

Therefore, the prosecutor's argument using abbreviated language in this instance was not improper.

¶88 Lastly, Henfling argues that the prosecutor misstated the reasonable belief standard of self-defense as subjective rather than objective. The prosecutor said a defendant is justified in self-defense if "he reasonably believes, it has to be his reasonable belief" that it is necessary, and that "it's his reasonable belief. It's not what we think might be a reasonable belief, but it's what he thought."

¶89 As previously discussed, the self-defense statutes require both that an actor hold a "belief that the circumstances provided a legal justification or excuse for the conduct" and that the actor's belief be objectively reasonable. *See* Utah Code Ann. § 76-5-203(4)(b) (LexisNexis 2017) (imperfect self-defense); *id.* § 76-2-402(2)(a) (Supp. 2019) (perfect self-defense); *see also State v. Sherard*, 818 P.2d 554, 561 (Utah Ct. App. 1991) (explaining that "reasonable" in the context of the self-defense statute means "objectively reasonable"). Even if the prosecutor's argument could be viewed as an isolated misstatement of the law, it was not a mistake that was so improper as to require defense counsel

---

(…continued)

Ann. § 76-2-402(2) (LexisNexis Supp. 2019), an injury, or lack thereof, could be evidence used to prove or disprove the formation of a reasonable belief necessary to justify self-defense—especially if the claimed reasonable belief is premised on testimony suggesting serious injury was sustained but such testimony is undermined by other evidence. We presume any argument by the prosecutor on this point was directed at witness credibility rather than at misstating the law. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning.").

to intervene with an objection, *see State v. Hulse*, 2019 UT App 105, ¶ 44, 444 P.3d 1158 (reviewing attorney's failure to object to prosecutor's statements during closing argument for "whether they were so improper that counsel's only defensible choice was to interrupt those comments with an objection" (cleaned up)), or so obvious and prejudicial as to warrant sua sponte intervention by the court, *State v. Roberts*, 2019 UT App 9, ¶ 14, 438 P.3d 885 ("The court must be certain that a prosecutor's statement is both highly prejudicial and obviously wrong before interrupting closing argument sua sponte." (cleaned up)). Rather, defense counsel could and did clarify the standard in closing argument with reference to the jury instruction capturing the correct standard. Accordingly, there was no prejudice stemming from the misstatement to support a claim of prosecutorial misconduct under the plain error or ineffective assistance of counsel claims.

¶90    Because we do not discern misconduct—or at least no prejudicial misconduct—in the challenged statements, we conclude that there is no support for Henfling's ineffective assistance of counsel or plain error claims.[15]

---

15. Henfling also contends "the cumulative effect of the several errors" was prejudicial. "We will reverse a conviction under this doctrine when the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. Ringstad*, 2018 UT App 66, ¶ 33, 424 P.3d 1052 (cleaned up). Because we see no harmful error—much less more than one—there are no errors to cumulate, and the doctrine is inapplicable. *See State v. Martinez-Castellanos*, 2018 UT 46, ¶ 35, 428 P.3d 1038 ("The cumulative error doctrine applies only to errors that could conceivably harm a party in some way. Errors with no potential for harm do not accumulate.").

V. Motion for Rule 23B Remand

¶91    Henfling also requests this Court "to remand the case to the trial court for entry of findings of fact, necessary for [our] determination of a claim of ineffective assistance of counsel" pursuant to rule 23B of the Utah Rules of Appellate Procedure. *See* Utah R. App. P. 23B(a). Henfling asserts he received ineffective assistance of counsel because defense counsel did not call an expert "to explain that the behavior and statements made by Henfling and [Sister] were typical and consistent reactions of someone in the throes of a traumatic experience." We deny Henfling's motion because he does not make "a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *See id.*

¶92    Even if Henfling has found an expert willing and able to provide the indicated testimony at trial, defense counsel's decision not to use an expert, but to present the information through other means, is not objectively unreasonable. "[C]ounsel's decision to call or not to call an expert witness is a matter of trial strategy, which will not be questioned and viewed as ineffectiveness unless there is no reasonable basis for that decision." *State v. Tyler*, 850 P.2d 1250, 1256 (Utah 1993); *see also State v. Ray*, 2020 UT 12, ¶ 36 (explaining the determination of a valid strategic reason for counsel's actions means that counsel did not perform deficiently, but the determination that counsel did not have a valid strategy does not automatically equate to constitutional inadequacy, and "the ultimate question [is] whether counsel's act or omission fell below an objective standard of reasonableness"). Here, there was a reasonable basis for defense counsel's decision not to use expert testimony. First, the idea that "trauma and alcohol" affected Henfling's and Sister's reactions and memories was presented through Sister's direct testimony and addressed in defense counsel's arguments. *See State v.*

*Montoya*, 2017 UT App 110, ¶¶ 26–29, 400 P.3d 1193 (holding defense counsel was not ineffective for decision to not call an expert witness where relevant information was presented by other means, and stating that "the calculations of counsel in weighing the pros and cons of one strategy over another is, in essence, a judgment about what is most likely to work to the client's benefit in a complex trial process that requires that many choices be made").

¶93 Second, the information did not require expert testimony because it was fairly intuitive. Defense counsel could reasonably conclude expert testimony on such factors that are "intuitive" and which "fall[] within the common sense of an average juror" would be "unnecessary and unhelpful to the jury." *See United States v. Angleton*, 269 F. Supp. 2d 868, 875–76 (S.D. Tex. 2003) (citing *United States v. Stevens*, 935 F.2d 1380 (3d Cir. 1991)); *see also State v. Houston*, 2015 UT 40, ¶¶ 83, 85, 353 P.3d 55 (as amended) (reiterating "that expert testimony is most helpful to explain topics that are beyond the common knowledge of ordinary jurors" and holding there was no ineffectiveness in decision to not call an expert because counsel could reasonably conclude that jurors would understand the topic based on life experience (cleaned up)); *cf. State v. King*, 2012 UT App 203, ¶ 23, 283 P.3d 980 ("While expert testimony might have been helpful if offered, we are unwilling to require that in every case where a key witness suffers from both addiction and mental illness such testimony must be offered. Under the present facts, we are not convinced that defense counsel's failure to obtain such an expert fell below the wide range of reasonable professional assistance." (cleaned up)).

¶94 Third, assuming defense counsel was aware of this expert, he reasonably may have concluded that any benefit in calling the expert would have been offset by the monetary cost. *See Harrington v. Richter*, 562 U.S. 86, 107 (2011)

("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

¶95 Fourth, defense counsel may have concluded that using an expert would have called unwanted attention to the varying accounts offered by Henfling and Sister, opened the door to discredit their testimonies, or undermined Henfling's claim of self-defense—a claim that relied on their memories of the events. *See State v. Willey*, 2011 UT App 23, ¶ 18, 248 P.3d 1014 ("Trial counsel's decision not to have a memory expert testify at trial fell well within the bounds of sound trial strategy because of counsel's legitimate concerns about the potentially detrimental effect of such expert testimony."). Because there was a reasonable basis for defense counsel's decision not to call the expert, his decision was not objectively unreasonable.

¶96 Additionally, Henfling could not show prejudice resulted from defense counsel's decision. Because any testimony by the expert would have been cumulative of other evidence, Henfling cannot establish that the jury would have reached a different conclusion. *See Montoya*, 2017 UT App 110, ¶¶ 29–30; *King*, 2012 UT App 203, ¶ 24. Furthermore, even if the expert testimony could have influenced the jury's perception of the witnesses' memory recall ability, it could not overcome the significant physical and forensic evidence—not to mention the blatantly contradictory facts offered by Henfling's varying accounts—upon which the jury relied to determine the details of the event and to convict Henfling.

¶97 Because Henfling cannot establish that defense counsel was ineffective even with the benefit of a remand, we deny the motion.

CONCLUSION

¶98    Henfling's claims of trial court error are unavailing. Because there was sufficient evidence to submit the case to the jury, the court did not err by declining to dismiss the murder charge. The court also did not err in upholding the felony-discharge-of-a-firearm conviction because the conviction applied in concert as a predicate offense with the murder conviction. Additionally, the trial court did not err by denying the motion for a new trial. No error in the jury instruction was harmful to Henfling. Moreover, Henfling has not shown that he was entitled to a new trial because he has not established error by the trial court or ineffective assistance of counsel in the alleged instances of prosecutorial misconduct as the prosecutor's arguments were proper.

¶99    Affirmed.

_____